**In re the Matter of Dennis Darol LINEHAN.**

**No. C1–95–2022.**

Court of Appeals of Minnesota.

Feb. 9, 1996.

Review Granted March 19, 1996.

Lisbeth J. Nudell, Minneapolis, Eric S. Janus, St. Paul, for appellant Linehan.

Hubert H. Humphrey, III, Attorney General, John L. Kirwin, Assistant Attorney General, St. Paul, for respondent State of Minnesota.

Susan Gaertner, Ramsey County Attorney, Mark Nathan Lystig, Assistant County Attorney, St. Paul, for respondent Ramsey County.

Daniel W. Homstad, Minneapolis, Kathleen Milner, Minneapolis, for amicus curiae Minnesota Civil Liberties Union.

Considered and decided by SHORT, P.J., RANDALL and PETERSON, JJ.

## OPINION

SHORT, Judge.

On appeal from a judgment of commitment as a sexually dangerous person, Dennis D. Linehan argues: (1) the proof fell short, as a matter of law, of the statutory elements; and (2) the sexually dangerous persons statute is unconstitutional.

## FACTS

While on parole from a state training school on July 25, 1956, Linehan took indecent liberties with a four-year-old girl. In February 1960, at the age of 19, Linehan engaged in sexual intercourse with a 13–year–old girl. In July 1963, Linehan beat and repeatedly raped L.H. In June 1965,

Linehan engaged in window peeping, spotted a young babysitter, and strangled her to death during an attempted sexual assault. Prior to his arrest, Linehan committed several more sexual assaults, including criminal sexual conduct with two 11– and 12–year–old sisters, and the rape of 22–year–old W.L.

In July 1965, Linehan was arrested. A grand jury indicted Linehan for murder in the first degree, murder in the second degree, and kidnapping. On October 1, 1965, Linehan pleaded guilty to kidnapping, and received a 40–year sentence. In June 1975, he escaped from the minimum security unit at Stillwater. Eleven days later, he was arrested in Michigan for sexually assaulting a 12–year–old girl. He was tried and convicted in Michigan. When the verdict was read, Linehan pointed a finger to the victim and said, "When I get out I am going to kill you." From July 1975 through September 1980, he served time in a Michigan prison and was returned then to complete his Minnesota sentence.

Linehan was due for parole in May 1992. In March, the Ramsey County Attorney's Office filed a petition for Linehan's commitment as a chemically dependent person and a psychopathic personality. After commitment hearings, the trial court denied the petition for commitment as a chemically dependent person, but committed Linehan for an indeterminate period as a psychopathic personality. We affirmed. The supreme court reversed the commitment, citing a lack of clear and convincing evidence that Linehan had an utter lack of power to control his sexual impulses. *In re Linehan,* 518 N.W.2d 609 (Minn.1994) (*Linehan I*). In 1994, Linehan was paroled, subject to specified conditions imposed by the Department of Corrections. First, Linehan lived in a house on the grounds of the Stillwater Correctional Facility. Second, Linehan's communications were subject to monitoring. And third, Linehan was under 24–hour–a–day surveillance by means of 4 cameras located at the house.

In September 1994, Ramsey County petitioned for Linehan's commitment under the newly-enacted sexually dangerous persons statute, Minn.Stat. § 253B.02, subd. 18b. At his commitment hearing, the trial court heard testimony from mental health professionals and corrections personnel. The director of a sex offenders group, in which Linehan has participated during his probation, described his participation in the group as appropriate and noted Linehan has developed a plan to avoid relapse. One of Linehan's parole agents testified he saw no indication that Linehan wanted to use chemicals or drugs, which conduct had played a role in his assaults. A court-appointed examiner testified Linehan does not presently exhibit a personality disorder, a sexual disorder, or a mental disorder, even though that expert had diagnosed Linehan with an antisocial personality disorder in 1992. By contrast, a licensed psychologist testified Linehan has an alcohol dependence (in remission), impulse control disorder, and an antisocial personality disorder and supported his commitment as a sexually dangerous person. Another licensed psychologist also diagnosed Linehan as a paraphilia with an antisocial personality disorder, and testified Linehan is highly likely to engage in harmful sexual conduct. Based on historical information, Linehan's treating psychologist at the security hospital diagnosed Linehan as having an antisocial personality disorder.

After considering the testimony, the trial court granted the county's petition, finding clear and convincing evidence that the combination of Linehan's course of harmful sexual conduct and personality disorder results in a high probability he will engage in future harmful sexual conduct.

## ISSUES

I. Is there clear and convincing evidence that Linehan meets the standards for commitment as a sexually dangerous person?

II. Is the sexually dangerous persons statute constitutional?

## ANALYSIS

### I.

■■■ To support the commitment of a sexually dangerous person, the state must establish the statutory elements by clear and

convincing evidence. Minn.Stat. § 253B.18, subd. 1 (1994); *see* Minn.Stat. § 253B.185, subd. 1 (1994) (court shall hear petition for commitment as a sexually dangerous person as provided in Minn.Stat. § 253B.18). We will not reverse a trial court's findings of fact unless they are clearly erroneous. *In re Joelson*, 385 N.W.2d 810, 811 (Minn.1986). However, we review de novo challenges that the state failed to prove, by clear and convincing evidence, the elements required to commit an individual under the sexually dangerous persons statute. *Cf. Linehan I*, 518 N.W.2d at 613 (reviewing de novo whether the state proved the elements necessary for commitment as a psychopathic personality).

A sexually dangerous person is an individual who (1) has engaged in a course of harmful sexual conduct, (2) has manifested a sexual, personality, or other mental disorder or dysfunction, and, (3) as a result, is likely to engage in future acts of harmful sexual conduct. Minn.Stat. § 253B.02, subd. 18b(a) (1994). Linehan argues the state failed to prove these elements by clear and convincing evidence.

### A. *Course of Harmful Sexual Conduct*

■ Harmful sexual conduct is sexual conduct that "creates a substantial likelihood of serious physical or emotional harm to another." Minn.Stat. § 253B.02, subd. 7a(a) (1994). A rebuttable presumption exists that conduct described in the definitions of criminal sexual conduct, in the first through fourth degrees, constitutes harmful sexual conduct. Minn.Stat. § 253B.02, subd. 7a(b) (1994). This presumption also applies to conduct described in the definitions of certain other serious crimes if the individual's sexual impulses motivated the behavior or if the conduct was part of a pattern of behavior having criminal sexual conduct as a goal. *Id.*

The trial court found Linehan engaged in numerous harmful acts, including taking indecent liberties with a four-year-old girl, raping two women, committing criminal sexual conduct with four different females, and killing a 14–year–old girl while attempting to sexually assault her. Most, if not all, of these acts create rebuttable presumptions of harmful sexual conduct under Minn.Stat.

§ 253B.02, subd. 7a(b). While they did not all result in criminal convictions, the statute does not require a conviction to establish a rebuttable presumption of harmful sexual conduct. *See id.* (creating a rebuttable presumption based on conduct *described* in various criminal statutes). This pattern of eight harmful sexual acts clearly and convincingly establishes a course of harmful sexual conduct. *See Linehan I*, 518 N.W.2d at 613 (finding this same conduct constituted a "habitual course of misconduct in sexual matters" for purposes of commitment as a psychopathic personality).

■ Linehan argues his acts of sexual misconduct are too remote in time to support commitment under the statute. However, Minn.Stat. § 253B.02, subd. 18b, contains no requirement of a recent overt act. *Cf. In re Young*, 122 Wash.2d 1, 857 P.2d 989, 1008–09 (1993) (concluding, under Washington's sexually violent predators statute, that the constitution does not require evidence of a recent act to prove dangerousness when the individual is currently incarcerated); *State v. Carpenter*, 197 Wis.2d 252, 541 N.W.2d 105, 114 (1995) (holding, under Wisconsin's sexually violent person statute, that the state need not produce evidence of a recent overt act to prove the probability of future acts of sexual violence if the committed person was incarcerated at the time the state filed the commitment petition, even though the defendant had been on parole for nine months before his reincarceration in July 1994). While Linehan has been on parole recently, he has been under 24–hour surveillance and living in a residence on the grounds of the correctional facility, thus simulating the protective conditions of prison. The psychopathic personality statute also allows the state to establish a "habitual course of misconduct in sexual matters" by evidence of remote acts of misconduct. *See* Minn.Stat. § 253B.02, subd. 18a (1994) (requiring evidence of a "habitual course of misconduct in sexual matters"); *Linehan I*, 518 N.W.2d at 613 (finding Linehan's criminal history (which remains unchanged in the current proceedings) demonstrates a habitual course of misconduct). The remoteness of any harmful sexual conduct affects the likelihood of future harm,

and not whether the acts constitute a course of harmful sexual conduct in the first instance. *Cf. Linehan I,* 518 N.W.2d at 614 (stating future dangerousness is predicated on the inability to control sexual impulses and requiring consideration of the recency of an individual's violent behavior when determining dangerousness).

### B. *Personality Disorder*

■ The trial court independently concluded Linehan manifests an Axis II diagnosis of antisocial personality disorder as defined by the American Psychiatric Association after hearing all of the facts and expert testimony. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 645, 649–50 (4th ed. 1994) (DSM–IV) (defining antisocial personality disorder and listing diagnostic criteria). The trial court relied on the DSM–IV, noting it "has a degree of acceptance in the forensic arena." It cited testimony of doctors, many of whom relied on the DSM–IV, and also testimony of Linehan's expert, who acknowledged the source is both widely used and accepted by mental health professionals and attorneys.

To support an antisocial personality disorder diagnosis, the DSM–IV requires the individual to meet at least three of the specified criteria to establish a "pervasive pattern of disregard for, and violation of, the rights of others." DSM–IV, at 645, 649. Of these criteria, the trial court found Linehan has shown:

— a failure to conform to social norms with respect to lawful behavior as indicated by repeatedly performing acts that are grounds for arrest;

— deceitfulness, as indicated by repeated lying, use of abuses, or conning others for personal profit or pleasure;

— irritability and aggressiveness, as indicated by repeated physical fights or assaults;

— consistent reckless disregard for safety of self or others; and

— lack of remorse as indicated by being indifferent to rationalizing having hurt, mistreated, or stolen from another.

*See id.* at 649–50 (setting forth the diagnostic criteria for an antisocial personality disorder). The trial court cited specific facts pertinent to each factor. The evidence supports each of these criteria, including expert testimony that Linehan had this diagnosis.

Linehan does not argue there is a lack of clear and convincing evidence to support a diagnosis that he has an antisocial personality disorder. Rather, Linehan argues this disorder cannot be a personality disorder within the meaning of the sexually dangerous persons statute because the antisocial personality disorder (1) does not bear a reasonable relationship to the purpose of his commitment, (2) can be applied to an individual no longer exhibiting serious antisocial behaviors, (3) would be extremely difficult to diagnose based on current behavior, and (4) is not necessarily an indicator of his current behavior. Linehan's arguments are misplaced because the statute requires only a finding of a "sexual, *personality,* or other mental *disorder* or dysfunction." Minn.Stat. § 253B.02, subd. 18b(a)(2) (emphasis added). Section 253B.02, subdivision 18b(a)(2) does not require this determination to be made solely on the basis of current behavior. Also, whether the disorder bears a reasonable relationship to the petitioned-for commitment is determined under section 253B.02, subdivision 18b(a)(3), requiring the disorder and course of harmful sexual conduct to likely *result in* future harm.

### C. *Resulting Likelihood of Future Harmful Sexual Conduct*

■ Based on expert testimony and its own experience, the trial court found the state established by clear and convincing evidence that, as a result of Linehan's past course of harmful sexual conduct and his personality disorder, it is "highly likely" he will engage in future acts of harmful sexual conduct. The trial court correctly concluded the statute's term "likely" requires future misconduct to be "highly likely." This is consistent with the requirement that the matter be proven by clear and convincing evidence. *See also Colorado v. New Mexico,*

467 U.S. 310, 316, 104 S.Ct. 2433, 2437–38, 81 L.Ed.2d 247 (1984) (noting the clear-and-convincing-evidence standard requires a determination that the factual contentions are "highly probable"); John William Strong et al., *McCormick on Evidence* § 340, at 442 (4th ed. 1992) (describing clear and convincing evidence as "highly probable"). *Compare* Minn.Stat. § 253B.18, subd. 1 (requiring proof for civil commitments by clear and convincing evidence), *and In re Blodgett,* 510 N.W.2d 910, 913 (Minn.) (describing the psychopathic personality statute as a *civil* commitment law), *cert. denied,* —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994) *with State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995) (reviewing a *criminal conviction* for proof beyond a reasonable doubt).

■■ Linehan argues that conflicting expert testimony precludes a finding, by clear and convincing evidence, of likely future dangerousness. However, while expert testimony may play a role in the determination of future dangerousness, it is not a conclusive factor. *See Linehan I,* 518 N.W.2d at 613–15 (concentrating on expert testimony regarding evidence on deficiencies in behavioral control, but directing lower courts to examine a list of factors in making predictions on dangerousness). The trial court should address the *Linehan I* factors as well as the committed person's relevant personal attributes and behavior. *See In re Pirkl,* 531 N.W.2d 902, 909–10 (Minn.App.1995) (conducting this type of analysis), *review denied* (Minn. Aug. 30, 1995). If this analysis tips the scale in favor of clear and convincing evidence, the future dangerousness element is met. *See id.* (affirming a commitment under the psychopathic personality statute on this basis).

Because of the conflicting expert testimony, the trial court found it necessary to consider other factors in addition to this testimony before reaching the determination that Linehan is likely to engage in future harmful sexual acts. Minnesota courts have previously considered the element of future dangerousness under the psychopathic personality commitment statute. *See* Minn.Stat. § 253B.02, subd. 18a (requiring a resulting dangerousness to others in order to commit an individual as a psychopathic personality);

*Linehan I,* 518 N.W.2d at 614 (establishing guidelines for determining dangerousness). In *Linehan I,* the supreme court held trial courts must consider the following factors, if such evidence is presented, when evaluating whether a person is dangerous to the public:

 (a) the person's relevant demographic characteristics (e.g., age, education, etc.);

 (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts);

 (c) the base rate statistics for violent behavior among individuals of this person's background (e.g., data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.);

 (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner);

 (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and

 (f) the person's record with respect to sex therapy programs.

*Linehan I,* 518 N.W.2d at 614. These factors apply equally to determining the probability that an individual will engage in harmful sexual conduct for purposes of the sexually dangerous persons statute. The trial court specifically considered and weighed *all* of the *Linehan I* factors. *See Pirkl,* 531 N.W.2d at 910 (holding it is for the trial court to weigh the *Linehan I* factors as a whole); *see also Linehan I,* 518 N.W.2d at 614 (requiring trial courts to *consider* these factors if relevant evidence is presented, but not indicating that a trial court must find any of them dispositive on the issue of dangerousness); *In re Bieganowski,* 520 N.W.2d 525, 530–31 (Minn.App. 1994) (upholding a commitment, the proceedings for which ended before the release of *Linehan I,* despite the trial court's failure to consider demographic data and base rate statistics because the trial court weighed many of the other *Linehan I* factors), *review denied* (Minn. Oct. 27, 1994).

Linehan specifically objects to consideration by the trial court of his prior offenses. While his last sexual offense occurred in 1975, Linehan has been either in a correctional facility or on probation, and under 24–hour surveillance, since that time. Linehan argues the 20–year gap between his last offense and the current commitment proceedings reduces any prediction of future dangerousness to speculation and conjecture. However, the remoteness of his sexual offenses, due to his supervised environment, does not necessarily negate a finding of future dangerousness. *See Linehan I*, 518 N.W.2d at 614 (requiring consideration of certain factors, *particularly when a large time gap separates the petition for commitment and the last act of sexual misconduct*); *Pirkl*, 531 N.W.2d at 909 (noting the trial court rejected, in affirming a psychopathic personality commitment, arguments regarding the remoteness of an individual's action because he had been in prison during the relevant time); *In re Welfare of Hofmaster*, 434 N.W.2d 279, 281 (Minn.App.1989) (noting, in the context of a mentally ill and dangerous commitment, that good behavior in a hospital does not conclusively determine the issue of dangerousness to others). Significantly, the only time Linehan has been unsupervised in the past 30 years, when he escaped from prison in 1975, he committed another violent, sexually-motivated assault against a 12–year–old girl.

Linehan also argues the trial court inappropriately dismissed the factors of base rate statistics and Linehan's age. However, the trial court thoroughly analyzed the evidence presented on base rate statistics and determined no clear conclusion followed. It noted the recidivism rate appeared too low because the statistics (1) covered only a three-year period following the release of convicted rapists, (2) considered rearrests for rape only and not other sexual offenses, and (3) likely excluded rapes that went unreported. The trial court also found Linehan has not followed the general pattern of those between the ages of 30 and 40 with antisocial behavior, because he reoffended in his mid–30s. Additionally, one expert testified the criminal behavior of child molesters does not slow with age to the same degree as for other

offenders. Because the trial court considered factors appropriate to Linehan's situation and the study's reliability, we cannot find error in the trial court's weighing of the base rate study.

In addition to the *Linehan I* factors, the trial court concluded Linehan's recent conduct and personality disorder demonstrates he is likely to commit future acts of harmful sexual conduct. First, at Linehan's commitment hearing, a security guard testified that, on three separate occasions, Linehan masturbated in his bathroom after engaging in physical play with his seven-year-old stepdaughter. Second, in an interview with a mental health professional, Linehan stated he does not masturbate, in direct contradiction to the security guard's testimony and his own testimony at the hearing. Third, Linehan displayed aggressiveness toward staff of the St. Peter hospital and on occasion has acted abusively toward correctional officers assigned to his parole residence. And fourth, Linehan has shown neither true remorse for his actions nor empathy for his victims. While Linehan vigorously disputes these factual findings, the record demonstrates (1) the trial court carefully evaluated all the evidence, and (2) there is ample evidence to support the trial court's findings. *See* Minn.R.Civ.P. 52.01 (requiring due regard to be given to a trial court's determination of witnesses' credibility); *Joelson*, 385 N.W.2d at 811 (attaching particular significance to the trial court's evaluation of credibility when the findings rest largely on expert testimony and *reversing* factual findings only when they are clearly erroneous).

The antisocial personality disorder involves a "pervasive pattern" of disregard for and violation of others' rights. DSM–IV, at 645, 649. The trial court found Linehan's actions demonstrate the continuing nature of this pattern, which began when he was a teenager and took indecent liberties with a four-year-old girl. Linehan argues these findings fail to establish that his personality disorder *caused* or *will cause* harmful sexual conduct. However, the sexually dangerous persons statute does not require a finding of actual causation, but only that an individual's personality disorder and a course of harmful

sexual conduct *result* in a *likelihood* of future harmful conduct. *See* Minn.Stat. § 253B.02, subd. 18b(a)(3) (employing the language "as a *result* ") (emphasis added); *Blodgett,* 510 N.W.2d at 914–16 (finding the psychopathic personality statute, which is not predicated on a lack of criminal responsibility, is constitutional). Under the circumstances, the state proved by clear and convincing evidence that Linehan's course of harmful sexual conduct and personality disorder results in a high probability that he will engage in further harmful sexual conduct.

## II.

Until recently, the psychopathic personality statute provided the only mechanism by which the state could civilly commit dangerous and mentally unstable, but sane, sex offenders. Minn.Stat. § 526.09 (1992) (later amended and recodified at Minn.Stat. § 253B.02, subd. 18a); *see also State ex rel. Pearson v. Probate Court of Ramsey County,* 205 Minn. 545, 550, 287 N.W. 297, 300 (1939) (construing the law to apply to unbalanced, but sane, people), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). While potentially broad in its literal application, the supreme court construed the statute's language to impose clear boundaries on its scope:

> [T]he act is intended to include those persons who by a habitual course of misconduct in sexual matters have evidenced an *utter lack of power to control* their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.

*Pearson,* 205 Minn. at 555, 287 N.W. at 302 (emphasis added).

In 1994, when the legislature amended the psychopathic personality statute to incorporate the *Pearson* holding, it also enacted a new law, which authorizes the commitment of sexually dangerous persons who clear and convincing evidence shows

(1) ha[ve] engaged in a course of harmful sexual conduct as defined in subdivision 7a;

(2) ha[ve] manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, [are] likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

Minn.Stat. § 253B.02, subd. 18b(a). Under this provision, the state need not demonstrate that the person wholly lacks the ability to control his or her sexual impulses. *Id.,* subd. 18b(b) (1994).

Linehan argues the new statute violates his state and federal constitutional rights to substantive due process and equal protection, as well as the prohibitions against ex post facto laws and double jeopardy. The statute's constitutionality presents a question of law, which we review de novo. *Estate of Jones v. Kvamme,* 529 N.W.2d 335, 337 (Minn.1995).

### A. *Burden of Proof*

Individuals who challenge a statute's constitutionality usually bear the heavy burden of proving their claim beyond a reasonable doubt. *Rio Vista Non–Profit Hous. Corp. v. County of Ramsey,* 335 N.W.2d 242, 245 (Minn.1983), *appeal dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). However, if the statute infringes on a fundamental right, the burden shifts to the *state* to prove the law is necessary to a compelling interest. *Skeen v. State,* 505 N.W.2d 299, 312 (Minn.1993). Linehan argues the trial court erroneously required him to prove the statute violates due process and equal protection. *See Blodgett,* 510 N.W.2d at 914, 916–17 (applying strict scrutiny because commitment burdens a fundamental right).

In both the introduction to and conclusion of its constitutional analysis, the trial court charged *Linehan* with proving the statute's unconstitutionality beyond a reasonable doubt. While the trial court invoked some of the language of strict constitutional scrutiny (i.e., "compelling interest" and "carefully limited"), a thorough reading of its analysis suggests the trial court placed the burden of proof on Linehan.

This error does not require us to reverse and remand for further consideration, provided a proper application of the law would have produced an identical result.

*See Brecht v. Schramm*, 266 N.W.2d 514, 520 (Minn.1978) ("If the trial court arrives at a correct decision, that decision should not be overturned regardless of the theory upon which it is based."); *cf. Adarand Constructors, Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2118, 132 L.Ed.2d 158 (1995) (suggesting the court of appeals could have independently tested a statute's constitutionality under strict scrutiny despite the trial court's application of a lower standard of review). Accordingly, we must independently evaluate whether the state has proven the law's constitutionality by demonstrating its narrow tailoring to a compelling interest.

### B. *Substantive Due Process*

 At the core of substantive due process lies the right to be free of governmentally-imposed physical restraint. *Foucha v. Louisiana,* 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992). The fundamental principles of our democratic society prohibit state incursions into this zone of personal liberty unless the government demonstrates such infringements are narrowly tailored to a compelling state interest. *Blodgett,* 510 N.W.2d at 914, 922 (the majority and Wahl, J., dissenting, agreeing strict scrutiny is the applicable constitutional burden of proof); *see also Young v. Weston,* 898 F.Supp. 744, 748 (W.D.Wash.1995) (same); *Young,* 857 P.2d at 1000 (same). Linehan argues strict scrutiny cannot tolerate the commitment of sexual predators who retain a measure of self-control.

Linehan agrees society has a compelling interest in protecting its members against the actions of known sexual predators who are mentally unstable and, as a result, almost certain to violate the physical and emotional integrity of their fellow citizens through harmful sexual conduct. *Young,* 857 P.2d at 1000; *State v. Post,* 197 Wis.2d 279, 541 N.W.2d 115, 122 (1995); *cf. Blodgett,* 510 N.W.2d at 914 (concluding the state has a compelling interest in protecting the public from individuals who suffer from an uncontrollable impulse to commit sexual assaults). However, Linehan argues the state has not proven the sexually dangerous persons statute enjoys a sufficiently close nexus to the government's compelling interest. *See Young,* 857 P.2d at 1000–01 (recognizing the state's compelling interest and holding the constitutional challenge to a similar statute had to rest on the nexus requirement); *Post,* 541 N.W.2d at 122–24 (recognizing the state's compelling interest and devoting the bulk of its analysis to the nexus requirement).

 Due process unquestionably forbids the government from restraining the eccentric, the socially maladjusted, or even those whose mental disorders do not render them dangerous. *See Foucha,* 504 U.S. at 77, 112 S.Ct. at 1784 (requiring the release of mentally ill persons who pose no danger); *Blodgett,* 510 N.W.2d at 914 (implying that commitment of the socially maladjusted would not be constitutional); *Pearson,* 205 Minn. at 555, 287 N.W. at 302–03 (suggesting it would be unconstitutional to authorize commitment of individuals simply because their sexual appetites lie outside the mainstream). However, due process tolerates mandatory confinement and treatment of those whose "volitional dysfunction[s] * * * grossly impair[ ] judgment and behavior with respect to the sex drive," making them highly likely to commit sexual assaults. *Blodgett,* 510 N.W.2d at 915 (explaining why an antisocial personality disorder can meet the constitutional requirement of "mental illness"); *see Post,* 541 N.W.2d at 122–24 (upholding as constitutional a nearly identical definition of "mental disorder," which was used for the statutory commitment of two sexual predators); *see also Young,* 857 P.2d at 1001–04 (arriving at a similar formulation of the constitutional measure of mental illness and upholding the commitment of two sexual predators under a statute that requires evidence of a mental "abnormality" or "disorder").

 As the supreme court has noted, neither the United States nor the Minnesota Constitution requires obvious lunacy as the predicate for physical confinement. *See Call v. Gomez,* 535 N.W.2d 312, 318 n. 4, 319 (Minn.1995) (recognizing that mental illness is a constitutional requirement for civil commitment, but rejecting "an utter lack of control" as the dividing line between acceptable confinement and mandatory release); *see also Blodgett,* 510 N.W.2d at 914–15 (reject-

ing the argument that the United States Constitution requires mental illness, *as defined by the medical profession,* for involuntary commitment); *Pearson,* 205 Minn. at 550, 287 N.W. at 300 (rejecting a state constitutional challenge of a law providing for the commitment of individuals who are not so insane as to avoid criminal responsibility); *see also Young,* 857 P.2d at 1006–07 n. 12 (agreeing with *Foucha* that an "antisocial personality" does not constitute mental illness for purposes of constitutional law, explaining the substantive differences between an "antisocial personality" and an "antisocial personality *disorder,*" and concluding the latter falls within the constitutional standard for mental illness); *cf. Foucha,* 504 U.S. at 88, 112 S.Ct. at 1789–90 (O'Connor, J., concurring and stating that involuntary commitment should not occur absent *some* medical justification). Persons whose mental afflictions leave them with a measure of self-control present an especially insidious risk, for they retain the ability to plan, wait, and delay the indulgence of their maladies until presented with a higher probability of success.

 Because the sexually dangerous persons statute requires clear and convincing evidence that a committed person suffers from a mental disorder or dysfunction, which affects that person's volition and judgment so significantly as to render him or her highly likely to continue a pattern of sexual assaults, the state has demonstrated the sexually dangerous persons statute is narrowly tailored to a compelling interest. *Foucha,* 504 U.S. at 75–77, 112 S.Ct. at 1783–84 (holding that clear and convincing evidence of mental illness and dangerousness will justify the deprivation of liberty inherent in civil commitment); *Blodgett,* 510 N.W.2d at 914–15 (declaring that a "volitional dysfunction which grossly impairs judgment and behavior with respect to the sex drive" qualifies as "mental illness" within the meaning of *Foucha*); *see Post,* 541 N.W.2d at 122–24 (reaching the same conclusion as *Blodgett*); *see also Young,* 857 P.2d at 1001–03 (arriving at a conclusion similar to *Blodgett*).

## C. *Equal Protection*

 Linehan also challenges the statute on equal protection grounds, arguing the state has failed to demonstrate that the legislative distinction between (1) the sexually dangerous and (2) the *mentally ill* and sexually dangerous is necessary to achieve a compelling state interest. *See Skeen,* 505 N.W.2d at 312 (defining strict scrutiny as shifting the burden of proof to the state, which must then demonstrate that a statute is necessary to a compelling state interest). However, the United States Supreme Court's decision in *Foucha* established this difference in situation is of fundamental constitutional significance. In its defense of the basic right to physical liberty, the Constitution will not tolerate the open-ended confinement of the "merely" dangerous. *Foucha,* 504 U.S. at 75–81, 112 S.Ct. at 1783–86. Rather, the community's interest in security becomes overwhelming when a dangerous person also suffers from a mental illness. *See id.* (allowing confinement under these circumstances). Because under *Foucha,* the state *must* discriminate between (1) the sexually dangerous, and (2) the *mentally ill* and sexually dangerous in matters of civil commitment, we find Linehan's equal protection challenge unavailing.

## D. *Ex Post Facto and Double Jeopardy*

 The Double Jeopardy and Ex Post Facto Clauses of the Minnesota and United States Constitutions limit the extent to which the state may penalize unpopular conduct. While protection against double jeopardy immunizes a defendant against multiple punishments for the same offense, the prohibition against ex post facto laws prevents the government from creating or increasing criminal penalties for past conduct. *See United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989) (defining the protection against double jeopardy); *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (explaining the prohibition against ex post facto laws). These constitutional guarantees apply only to penal laws. Moreover, the strong presumption in favor of a statute's constitutionality applies until the challenging party has dem-

onstrated the law's penal nature and, thus, the infringement of a fundamental right. *See Allen v. Illinois*, 478 U.S. 364, 369, 106 S.Ct. 2988, 2992, 92 L.Ed.2d 296 (1986) (quoting *United States v. Ward*, 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980), for the proposition that only "the clearest proof" of overriding punitive purpose or effect will overcome the civil label attached to a statute); *Young*, 857 P.2d at 997 (quoting *id.* in analyzing, for purposes of double jeopardy and ex post facto doctrine, the status of Washington's equivalent to the sexually dangerous persons statute); *see also Weston*, 898 F.Supp. at 751, 753–54 (applying the same presumption and stating the analysis of a law's civil or criminal status is identical for double jeopardy and ex post facto purposes); *Carpenter*, 541 N.W.2d at 109, 113 (requiring defendants to overcome a heavy presumption of constitutionality in challenging Wisconsin's analog to the sexually dangerous persons statute on double jeopardy grounds and analyzing the law's status for double jeopardy and ex post facto purposes in the same manner).

█ Linehan argues the sexually dangerous persons statute's purpose and effect, the open-ended detention of likely recidivist sexual offenders who have completed their criminal sentences, overcomes its formally civil designation. *See Weston*, 898 F.Supp. at 753–54 (concluding a similar statute manifested a preoccupation with punishment, rendering it a penal law for double jeopardy and ex post facto purposes). However, if a law's unpleasant consequences flow from the legislature's intent to regulate a present condition, and not to punish past behavior, the law is not penal. *De Veau v. Braisted*, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960) (plurality opinion).

█ The sexually dangerous persons statute serves as a vehicle for treatment of a committed person's present condition and is qualified by his or her rights to petition for relaxed conditions, immediate release upon successful treatment, and independent judicial review. *See* Minn.Stat. § 253B.185, subd. 1 (1994) (affording *both* sexually dangerous persons *and* people with psychopathic personalities the same rights and procedural

safeguards enjoyed by the mentally ill and dangerous); *Blodgett*, 510 N.W.2d at 916 (listing the rights to treatment, review, and release enjoyed by a person committed under the psychopathic personality statute). As such, the statute does not endorse punishment, which would subject it to the limitations imposed by the Double Jeopardy and Ex Post Facto Clauses, but is a civil and remedial framework from which a committed person may exit as soon as he or she overcomes either his or her mental affliction or dangerousness. *See Call*, 535 N.W.2d at 319–20 (citing *Blodgett* as authority for the proposition that the psychopathic personality statute's treatment component renders the law nonpunitive); *see also Young*, 857 P.2d at 997 (citing the therapeutic component and right to release when no longer dangerous as factors strongly supporting the court's ultimate conclusion that the local equivalent of the sexually dangerous persons statute is nonpunitive); *Carpenter*, 541 N.W.2d at 111 (same). Therefore, the sexually dangerous persons statute is constitutional.

## DECISION

There is clear and convincing evidence Linehan's course of harmful sexual conduct and his personality disorder results in a high probability that he will engage in future harmful sexual conduct. The sexually dangerous persons statute, Minn.Stat. § 253B.02, subd. 18b, is valid under both state and federal constitutions. Thus, the trial court properly committed Linehan to the Minnesota Security Hospital for an indeterminate period as a sexually dangerous person.

**Affirmed.**

RANDALL, Judge (dissenting).

I respectfully dissent. Our case today is round 4 of the *State v. Dennis Darol Linehan*.

Round 1 was the seminal case from which all else follow *State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 287 N.W. 297 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940).

Round 2 was *In re Blodgett*, 510 N.W.2d 910 (Minn.), *cert. denied*, —— U.S. ——, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994), a Minnesota supreme court case narrowly upholding the psychopathic personality statute, "SDP's" predecessor. Vocal dissents pointed out its tenuous logic. The foundation of these "civil" commitment statutes for dangerous people is inherently tenuous. No court can escape the one undeniable constitutional argument that no citizen can be imprisoned in a state facility after they have served all of their time. Exceptions, such as being convicted of a new jailable offense while in prison or violating terms of probation or parole after release, are not at issue.

Round 3 was *Linehan I*, 518 N.W.2d 609 (Minn.1994), where the supreme court reversed and remanded Linehan's commitment as a psychopathic personality holding the state did not carry its burden of proof on the essential elements.

Round 4 was the Minnesota Legislature's hasty assembly, in view of *Linehan I*, to figure out a legal way to keep Linehan in a secured facility, behind bars,[1] after all of his time was served. The result was the "sexually dangerous persons" statute, Minn.Stat. § 253B.02, subd. 18b (1994), which we decide today against a frontal attack on substantive constitutional grounds. Our opinion will be Round 5. The probable petition for certiorari to the Minnesota Supreme Court will be the sixth round, and if they accept certiorari, that will become the seventh round. If they accept certiorari, the eighth round may be the United States Supreme Court.

This is Linehan's first case under this brand new statute, which was designated specifically with Linehan in mind. Linehan is sui generis, unique. He is our World War II Eddie Slovik, our colonial Phillip Nolan, our victorian England's Elephant Man. Will there be more? I suspect so.

I suspect our state legislature and the courts will continue to struggle with how to legally incarcerate people after they are entitled to be released. Others will likely follow Linehan.

*State ex rel. Pearson*, was never a favored case to start with. Not all states have the equivalent of a psychopathic personality/sexually dangerous persons (PP/SDP) statute. When Minnesota's PP/SDP test case, *State ex rel. Pearson*, went to the United States Supreme Court in the late 1930s, the statute was aimed, not at the Linehans of its day, but rather aimed at the recidivistic (and often times feeble-minded) public masturbator, the window peeper, the exposer, the little old man who gave candy to little boys and girls. It was never meant for people convicted of hardened sexual crimes. Those individuals were given their right to a fair criminal trial, and if convicted, were detained and punished under a basic criminal justice system. For those chosen to be handled under the PP/SDP statute, it was always as the result of a conscious choice by the state to bypass the criminal justice system as not needed, and to civilly commit truly mentally ill people who needed medical treatment. All writings and dissertations during the early years concerning the genesis and use of the PP/SDP statute tell us this is so.

Then approximately six to eight years ago, the State of Minnesota went through a small series of highly visible crimes, including rape and rape/murder, that galvanized law enforcement and prosecutors into wanting to do something. They read the politics of public and voter perception to mean that certain individuals with dangerous sexual proclivities were to be kept behind bars somewhere, somehow, and that whatever it takes to be done should be done.

Thus, the old psychopathic personality statute was dusted off, and, more importantly, was used, not to civilly commit and keep people out of the criminal justice system, but was deliberately held back until certain convicted criminals were nearing the end of their served sentences, and then activated against them so that upon release from prison, they would now undergo indeterminate, and hopefully very lengthy, incarceration in a secured "medical" facility.

It is not in dispute that those advocating this new and extended use of the PP/SDP

---

1. Make no mistake. The medical facilities designated in the statute are the equivalent of medium to maximum security prisons. This is intentional, not accidental.

statute and those warning against because of its high potential for serious constitutional abuse agree as one that PP/SDP must be done "civilly." Criminal commitment, not based on the criminal justice system with its requirement of a fair trial and presumption of innocence, is out of the question. The use in Nazi Germany and the Soviet system, under Stalin, of "Gulags," for dissidents, eccentrics, Gypsies, and other ethnic groups, is not tolerated. Respondent concedes that Linehan is close to serving every hour of every day that he owes the State of Minnesota for long ago criminal acts. From the criminal justice standpoint, when his last day comes, he has earned his release.

Now we need to address the overriding element which the State must surmount to get by with what they want to do. Our Minnesota law is subservient, as all state laws are, to the constitutional rights of all citizens spelled out in the United States Constitution. No citation is needed for the proposition that a state cannot take away rights guaranteed by the United States Constitution, but rather it is limited to granting at least the same or more.

The United States Supreme Court again took a look at *In Re Pearson* and its progeny, *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). *Foucha* discussed the Louisiana civil commitment equivalent of our SDP and its predecessor, the psychopathic personality statute.

In *Foucha*, the United States Supreme Court stated:

> The Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them." * * * Freedom from bodily restraint has always been at the core of the liberty protected by the due process clause from arbitrary governmental action. * * * "It is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."

504 U.S. 71 at 80, 112 S.Ct. 1780 at 1785 (citations omitted).

The court in *Foucha* discussed the circumstances under which a person may be deprived of liberty, summarized in *Blodgett* as follows:

> (a) imprisonment of convicted criminals for purpose of deterrence and rehabilitation;
>
> (b) confinement for persons mentally ill and dangerous; and
>
> (c) in 'certain narrow circumstances, persons who pose a danger to others or to the community may be subject to limited confinement,' such as pretrial detention of dangerous criminal defendants.

*Blodgett*, 510 N.W.2d at 914 (citation omitted).

In *Foucha*, the Supreme Court held unconstitutional a Louisiana commitment statute which allowed a person acquitted by reason of insanity, who had an antisocial personality disorder, but no longer a true mental illness, to remain indefinitely committed to the mental hospital *on the basis of dangerousness alone*. The Louisiana commitment statute seriously violated substantive due process and procedural rights, rights grounded in the sacred proposition that personal liberty cannot easily be tampered with, even when we do not like somebody. Even when we fear what they might do in the future. They are entitled to honest due process.

We can rightfully incarcerate for past acts after a fair trial. It is dangerous to incarcerate dissidents based on pure projection. Medical experts throughout the country differ, not only in the predictability of dangerousness, but on the methods by which they predict. This case today is similar. One medical expert said Linehan is not mentally ill. Other experts said he is "mentally ill."

*Foucha* is instructive. It appears the United States Supreme Court is telling us clearly that a convicted criminal, even one with an antisocial personality disorder for which there may be no effective treatment, cannot be held indefinitely under the guise of "medical treatment," when the real purpose is medical incarceration for reasons of public safety. The *Foucha* court disallowed further incarceration for Foucha based not on what he had done, but on what he "might do."

Our *Foucha* issue is not (c) because we are not talking about "limited confinement." We are talking about indefinite and possibly life-long deprivation of liberty. This can no more be done in a locked and secured hospital secretly than it can be done in a locked and secured prison openly.

The issue here is not (a) as Linehan will soon complete his prescribed term of imprisonment. The issue here is squarely confined to (b). To do what the state wants to do, Linehan has to be both mentally ill and dangerous, and the "mentally ill" portion must be substantially more than a subterfuge to keep dangerous people locked up after they have served every day that they are supposed to serve.

So today the majority, acknowledging the viability and mandates of *Foucha,* properly concentrates on the "mentally ill" portion, coupled with dangerousness. The mental illness provided by the statute for SDP in many ways is a carbon copy of psychopathic personality. I note that the "utter lack of power and ability to control sexual impulses" is deleted. I suspect this died an unmourned death. The majority in *Linehan I* did not find the "utter lack" of control. 518 N.W.2d 609, 614 (Minn.1994).

The dissent of Justice Gardebring pointed out that "utter lack" could be found, but shouldn't be because if found, its finding would constitute an attack on the *sine qua non* of judicial reasoning, logic, and common sense. The Gardebring dissent pointed out that all the Linehans of the world are convicted criminally for crimes almost always involving, as an essential element, a specific intent to do something wrong. 518 N.W.2d at 614–616 (Gardebring, J., and Coyne, J., dissenting). But somehow, when their prison time is over and the state wants to incarcerate them civilly, the state is most solicitous and forgiving of their intent to offend (which by definition had been proven by proof beyond a reasonable doubt in their criminal trial), and now postulates that the poor defendant has lost complete control of himself and now exhibits an utter lack of control over his sexual impulses and now needs treatment.

Since it is never explained how, between the date of criminal conviction and the expiration of prison time, one's specific intent (*mens rea*) to do something wrong disappears into a void, and is replaced by an utter lack of ability to control ones impulses, it can only be presumed that it happens in prison life, perhaps by osmosis.

Thus, following *Linehan I,* the need for SDP was born. The statute, and other collateral changes to the commitment statutes, were aimed squarely at Dennis Linehan. To state otherwise is to be without candor. Linehan became the focus, not just of the media and the Minnesota Legislature, but actually became a talking point in a contested election for the position of the Ramsey County Attorney's office.

The legislative history of SDP, including the open debates and the recommendations and writings from staff, tell us that the overwhelming urge to pass this new version of the PP/SDP statute was a direct response to concerns about public safety. The statute was needed to ensure the continued incarceration of Dennis Linehan.

At times the word "treatment" was mentioned, but always in passing, before the real issue, continued confinement for reasons of public safety and deterrence, was again the focus.

To recognize the truth of the above, we need to look at nothing other than the legislation. To ensure Linehan's continued confinement, and the confinement of the Linehans to follow, the legislature carefully looked at the former essential element of proof that PP/SDP statutes normally carry. That element is a showing that the proposed committee truly harmed people. They removed that element. They removed it by bringing forth the "rebuttable presumption of harm." Minn.Stat. § 253B.02, subd. 7a(b). Put another way, certain acts create a rebuttable presumption that harm was done and the burden shifts to the defendant to show "I did no harm." The legislative background is honest and instructive. It was conceded this would be a virtually impossible burden for any proposed committee to bear; thus insuring his indefinite commitment.

The only example I could find in the legislative history where a proposed committee might have a chance to beat continued confinement was the example given of where the aggressor was a 19 year old woman and the victim a 15 year old boy. There it was thought possible that the 19 year old woman might be able to show that although she broke the law concerning one of our many statutes forbidding illegal sexual conduct, she might be able to bear her burden of proof to show there was no serious emotional or physical harm.

In other words, by adding the rebuttable presumption of harm, the SDP statute now summarily forecloses any person's chances of not being committed. I suggest the statutory mandate of rebuttable presumption is a pure denial of constitutional due process and, standing alone, even if there were no other problems with the statute, voids, on constitutional grounds, the SDP we examine today.

But there are other problems with this new statute. The majority, acknowledging the viability of *Foucha*, sets out the trial court's reliance on certain facts and testimony in the record to clear the hurdle that Linehan must be mentally ill, as well as dangerous, before he can be committed as an SDP. The majority states:

> A court-appointed examiner testified Linehan does not presently exhibit a personality disorder, a sexual disorder, or a mental disorder, even though that expert had diagnosed Linehan with an *antisocial personality disorder* in 1992. By contrast, a licensed psychologist testified Linehan has an alcohol dependence (in remission), impulse control disorder, and an *antisocial personality disorder* and supported his commitment as a sexually dangerous person. Another licensed psychologist also diagnosed Linehan as a paraphilia with an *antisocial personality disorder,* and testified Linehan is highly likely to engage in harmful sexual conduct. Linehan's treating psychologist at the security hospital diagnosed Linehan as having a *antisocial personality disorder* based on historical information.

(emphasis added.)

First of all, I note that one court-appointed examiner found that although Linehan had an antisocial personality disorder, he was not even mentally ill. The other experts quoted, each in turn, Linehan's "antisocial personality disorder" as one of the underpinnings to fit Linehan under the SDP model of mental illness.

Now let us revisit *Foucha*. The U.S. Supreme Court struck down as unconstitutional a Louisiana state statute allowing continued, indefinite confinement of a man found dangerous but possessing only an "antisocial personality." *Foucha,* 504 U.S. 71, 112 S.Ct. 1780 (1992). Based on the medical testimony in *Foucha,* the court found that "antisocial personality" was not enough of a true mental disease to qualify as one of the two constitutionally essential elements for indefinite commitment, to-wit: *both* "mentally ill" and "dangerous." *Id.* 504 U.S. at 77–86, 112 S.Ct. at 1784–1788.

Now superimpose on the weak reliance of the state to commit Linehan as a SDP based on medical experts who continuously found Linehan to have an antisocial personality, the "rebuttable presumption of harm." The handwriting is not only on the wall, but chiseled in two inch high block letters; this new PP/SDP statute is so constitutionally infirm that it cannot stand.

I cannot state with any degree of certainty that the medical testimony about Linehan would have convinced the U.S. Supreme Court to change the result in *Foucha.*

Let us discuss a little further the suspect part of SDP that mandates a rebuttable presumption of harm to be used against Linehan and the Linehans to follow.

Trial courts and appellate courts, have for years analyzed, discussed, and made findings in hundreds of standard civil commitment cases where the issue is simply your basic mentally ill person who is deemed incapable of taking care of themselves, a threat to themselves or others, and who thus need real medical treatment. Minn.Stat. §§ 253B.09, subd. 1, 253B.02, Subd. 13(b).

Courts have, on scores of occasions, heard the same or similar litanies of how a man or a woman, the proposed civil committee, does

not employ the usual personal hygiene, has long and unkempt hair, does not feed themselves properly, perhaps even appears malnourished, goes out in cold weather without a hat, gloves or proper outer clothing, does not seek proper medical help or take prescribed medication, and so on and so forth.

All of these together "may" constitute evidence that the person is a threat to themselves, and if so, that coupled with the finding of mental illness can lead to a sound and hopefully short civil commitment.

Now let us assume that downtown shoppers and business people in the Twin Cities began a campaign against street persons, panhandlers, those who seem to mill about our scattered soup kitchens and missions without real purpose, or evidence of gainful occupation. It is not uncommon for the city councils of many large cities to want to do such a sweep as part of a downtown beautification program to encourage development and tourist dollars. So now let us assume that in addition to wanting the city police to adopt periodic sweeps, the downtown business people convince that state's legislature to start civilly committing the street people who just won't go away, but appear to be coming in and out of police precincts on a revolving door basis. So, to help make sure the commitments stand, the legislature passes a statute that says there is a rebuttable presumption that you can be committed if, for instance, your weight drops 30% within seven weeks or less, you are found outdoors where the windchill factor is a minus 15 degrees or lower, without mittens, a hat, scarf and boots, or you are found sleeping in a totally unheated apartment with the wind blowing through a broken window. *See* Minn.Stat. § 253B.02, Subd. 13(b)(i).

All of the above are commonly seen in petitions for commitment by well-meaning relatives or social workers or medical personnel. *But they are only considered evidentiary.* They do not shift the burden of proof. The patient is allowed to point out the circumstances under which their weight dropped, or why they went outside without proper clothing, or slept in an apartment that did not pass code standards. If we superim-

posed on that evidence a statutorily mandated rebuttable presumption that those conditions would put you in a mental hospital, I suggest virtually every attorney and judge in this state of a civil libertarian bent would rise in concern to combat such a mandated presumption.

How different is that from the rebuttable presumption in the SDP statute that includes every act of criminal sexual conduct down to the fourth degree. The rebuttable presumption further includes acts with a sexual impulse or sexual gratification as a goal. When that is found, the rebuttable presumption includes nonsexual crimes beginning with numerous degrees of homicide and assault all the way down to assault in the third degree, simple robbery, arson, terroristic threats, harassment in stalking, and tampering with a witness.[2] *See* Minn.Stat. § 253B.02, subd. 7a(b).

The only honest inference is that the decks are intentionally stacked against anyone who is tagged with the prospective label "SDP." For reasons of public safety and deterrence, they are going to a secure locked facility, after they have served all the time they owe the state in secured locked facilities.

I can no longer accept the argument that PP/SDP is about remediation and medical treatment. If medical treatment were part of the prosecution's game plan, they would bring the PP/SDP charge as soon as possible after the inmate's conviction and initial incarceration. The state has every right at that point to invoke the PP/SDP statute. In recent years they appear to deliberately choose not to invoke the statute at the onset of the person's time in prison. In fact, one could argue the state ignores public safety by intentionally not invoking the statute at the onset of incarceration and that may allow the defendant to go untreated for several years while he serves his time in prison. It needs no reference to note that all medical experts agree that the sooner symptoms are diagnosed, the sooner treatment should be begun.

The state may counter this argument by pointing out that you do not have to be a

**2.** I did not make this up. *See* Minn.Stat. § 253B.02, subd. 7a(b).

candidate for PP/SDP to get treatment in prison in the various programs for sexual offenders. I agree that is so. But if that is so, and sexual offender treatment is available from the outset, then why does the state so strongly want to tack on PP/SDP at the end? If the answer be that the normal sexual treatment programs in prison are voluntary rather than mandatory, then once a person is determined to fit the PP/SDP profile, can not a legal carrot be found to ensure participation in the prison program? Could we not craft a law that someone so found, after a fair hearing, to fit the PP/SDP profile, could have extra years of intensive supervised release added on to his or her time upon their release date from prison, if they did not voluntarily take part in prison treatment?

The legislative deliberations that led to the passage of the new PP/SDP laws noted that in one control group, a probation officer with approximately a 15 man case load (instead of the normal 75) was able to truly supervise intensely, and the recidivism rate was exceptionally low compared to those offenders who had probation officers staggering under the normal full case load.

There is always the danger that if this program worked, the legislature would immediately want to add it to crime category after crime category. Right now, the only offenders in Minnesota who technically are on parole for life after they are released are those convicted of murder in the first degree. Although their time of parole can be dropped after a certain number of years out of prison, there is no absolute right to that, so they can literally be on the intensive supervised release/parole for life. For all other offenses, after full expiration of the sentences served, either through straight prison time or through a combination of prison and probation time, there is no more probation absent a new offense. It would be important to carefully craft any law that would add intensive supervised release after the normal expiration of one's prison sentence. But extended intensive supervised release, being a far, far, far less deprivation of liberty than incarceration in a locked medical facility, is a goal that could more easily pass constitutional muster.

Instead, what the state does here is intentional. They wait until the target defendant is down to several months before expiration, then they invoke the PP/SDP statute so that the "civil commitment" will be used to ensure safe confinement after release.

If it is argued that intensive treatment for inmates with sexual disorders is costly in prison, the only answer is, it is *far, far* more costly to first incarcerate a person for a lengthy period of time, and then begin the PP/SDP process after expiration when they are now confined to state security hospitals where the yearly cost is *even higher* than while in prison. In other words, the public, from both a cost dollar and public safety standpoint, is far better served by instituting the treatment for those for whom it is deemed needed as soon as possible after incarceration. The money, and then some, for intensive sexual offender treatment programs while in prison would easily come from the tremendous savings to be effected by the now long needed adjustment of Minnesota's mandatory prison time on our various sentences once the Minnesota sentencing guidelines level 7 is reached.

Essentially, except for murder in the first degree, all other offenses have a determinate period, a true expiration date. When you are sentenced under the sentencing guidelines, whether it is presumptive, an upward departure, or a downward departure, you will serve two-thirds of that sentence in prison and then one-third of the sentence on probation. Minnesota's mandatory two-thirds in prison requirement is one of the highest in the entire nation. Minnesota need not be concerned about longer sentences, but rather need be concerned about sentences now that in many cases are far too long. If the present requirement of 66⅔% of the sentence to be spent behind bars were shortened to perhaps 55% for the more violent offenders, and then down to 50% for all others, the money freed up from having to warehouse men and women would run into the millions and could be used for more prison programs and more up-front programs to help prevent crime, as opposed to spending hundreds of millions merely to punish past acts. Even this slight adjustment to our mandated incarceration

time would still leave Minnesota among the leaders in this country in the amount of time men and women actually do behind bars.

Virtually the clearest argument that PP/SDP is for punishment and confinement, and not for treatment, is that we devised a civil commitment statute only for sexual offenders. If sexual offenders are truly deserving of medical treatment, then why not all other felons who commit dangerous acts:

> We do not commit and do not attempt "to treat" first degree murderers, even contract killers, even if they have sworn vengeance against their accusers, after they have served all their time. They may be released with strong warnings not to run afoul of the law again. If there is any probation or parole time left, the state might well "sit on their heads" with onerous release conditions, but no attempt is made to commit them against their will to a hospital. First degree murder is as serious, or more serious, than sex offenses, so we cannot distinguish between the two on the basis of who has done the more heinous thing. We do not attempt to involuntarily commit and treat habitual check forgers, even though their recidivism is high or higher than sex offenders. So we cannot differentiate between the two classes on the basis of recidivism.
>
> Also, we do not try to involuntarily commit and then treat kleptomaniacs, pyromaniacs, or any other of the "manias" that are criminal conduct. Respondent alludes to this reasoning, and argues that sexual offenders are dangerous in a way different than those who commit these other offenses. *See also Blodgett,* 510 N.W.2d at 917 (stating there are substantial distinctions between sexual predators and other criminals). That reasoning, however, is not constitutionally significant. *Instead, it proves the point. Psychopathic personalities are the subject of preventive detention.* The state simply chooses this one class of people, to the exclusion of other classes of felons, to involuntarily commit to protect the public from any further possibility of harm—read preventive detention.
>
> The allusions to treatment are a guise to justify the detention. These offenders had

access to treatment programs in prison during the fairly lengthy criminal sentences they served. The medical personnel at the security hospital are clear that confinement is the guiding force, not medical treatment.

*In Re Mattson,* No. C5-95-452, unpub. op. at 2-4, 1995 WL 365374 (Minn.App. June 20, 1995) (emphasis added).

I respectfully dissent. I conclude that the new Minnesota sexually dangerous person statute is unconstitutional when examined in light of the *Foucha* holding that a dangerous person with an antisocial personality can be incarcerated for crimes committed in the past, but can neither be incarcerated nor "medically confined" for what he might do in the future. Further, the rebuttable presumption of harm built into the sexually dangerous personality statute directs our attention, like nothing else can, to the fact that this statute is based purely on public safety concerns, employs preventive detention, thus unlawfully incarcerating citizens in a secured and locked medical facility, not for a crime, but for speculation.