In re Barry Michael BIEGANOWSKI,
Alleged Psychopathic Personality.

No. C2–94–544.

Court of Appeals of Minnesota.

Aug. 23, 1994.

Review Denied Oct. 27, 1994.

Ronald L. Greenley, Nicol & Greenley, Ltd., Anoka, for appellant Bieganowski.

Robert M.A. Johnson, Anoka County Atty., Janice Allen Wheat, Asst. County Atty., Anoka, for respondent.

Considered and decided by CRIPPEN, P.J., and PARKER and PETERSON, JJ.

## OPINION

PETERSON, Judge.

Barry Michael Bieganowski was committed for an indeterminate period as a psychopathic personality. He appeals, raising evidentiary issues and challenging the sufficiency of the evidence and the determination that the Minnesota Security Hospital was the least restrictive treatment alternative. We affirm.

## FACTS

Appellant sexually assaulted his sister-in-law in 1979, when she was 16 and he was 20. Appellant indicated he could not have sex with his wife because she was eight and a half months pregnant and sex with his sister-in-law "felt right at the time." He beat her with his fists, causing bruising around her eyes, face and throat, disrobed her, and forced her to engage in sexual intercourse. Appellant pleaded guilty to third degree criminal sexual conduct in January 1980 and was sent to prison. He was paroled on February 16, 1982 and later violated parole by leaving the state without permission and failing to maintain contact with his parole officer. He was arrested in New York State on June 15, 1983, returned to Minnesota, and served 120 days for his parole violation. He was released on October 13, 1983.

From December 1983 until his arrest in January 1985, appellant engaged in multiple acts of oral sex with his seven-year-old son and six-year-old stepdaughter, and in anal intercourse on at least one occasion with his seven-year-old son. He did so because a friend told him about sex with young children and he "experimented" with his children in order to experience it himself. He took sexually explicit photographs of the children, including ones depicting him engaging in oral sex with them. He took the pictures, he explained, because "[t]he camera was hanging on the doorknob. * * * I don't know what possessed me." Appellant pleaded guilty to first degree criminal sexual conduct and first degree intrafamilial sexual conduct. He was incarcerated at Oak Park Heights from April 1985 to February 1992. Appellant's parental rights to his son have since been terminated, and his marriage dissolved.

In January 1992, a petition for judicial commitment as a psychopathic personality was filed. On June 3, 1992, after a hearing, an order was issued finding appellant had a psychopathic personality. An additional hearing to determine his placement was set for June 26, 1992.

On June 18, 1992, the Corrections Department conducted a random alcohol test on appellant, who had been placed on restrictive release. Appellant failed the test, which was a violation of the terms of his release. While the corrections employee called for a peace officer to make an arrest, appellant escaped. A warrant was issued for his arrest.

At the placement hearing on June 26, 1992, appellant's whereabouts were unknown. On June 29, 1992, a judgment was entered committing appellant as a psychopathic personality to the Minnesota Security Hospital.

Appellant was ultimately captured and placed at the Minnesota Security Hospital. A review hearing was held following the initial commitment period. Appellant testified that after his escape in June 1992, he took a Greyhound bus to New York. He initially resided with his father and stepmother, who was a day care provider. He met the mother of two children who attended the day care; they formed a relationship and she became pregnant with his child. He also stayed with his half-sister and her husband; his half-sister had 11-year-old and 14-year-old stepdaughters who visited. On January 9, 1993, the FBI tracked appellant to his parents' home. To avoid apprehension, appellant moved to the home of a couple with five sons. Early in February 1993, he moved again, this time to the home of a couple with two children, including 14-year-old C.G. He lived at this home until his arrest on March 4, 1993.

On October 21, 1993, C.G. gave a statement to a police investigator, describing how appellant had sexually abused her while he resided with her family during February 1993. At the review hearing, C.G. and her father testified about the alleged incident by telephone from their home in New York. A

deputy sheriff was present at the home to identify and sequester the witnesses, and a court reporter was present to place the witnesses under oath and record the proceedings. The testimony was transmitted by speakerphone to the trial court's chambers and was also recorded by the court's reporter. Appellant objected to the trial court receiving testimony over the telephone and denied C.G.'s allegations.

Dr. Michael Farnsworth, a psychiatrist who is the head of the sex offender division at the security hospital, testified that during appellant's stay at the hospital there had been no substantial change in his condition. He did not engage in treatment offered him, and did not believe he could benefit either from chemical dependency treatment or from other treatment. Dr. Farnsworth's August 25, 1993 report to the court, in which he indicated that appellant's prognosis was poor, was prepared prior to his receiving copies of documents from New York concerning appellant's conduct while in New York. Dr. Farnsworth testified that even without considering any of the information from New York, there is a great likelihood that appellant will offend again. But, he found the information regarding C.G. would be significant.

With respect to the *Pearson* criteria,[1] Dr. Farnsworth testified that appellant's behavior in sexual matters is habitual in nature. He had difficulty finding that the *Pearson* standard of utter lack of power to control sexual impulses could be met. His difficulty stems from the grooming behavior exhibited by pedophiles, which involves some planning and foresight, and which is, therefore, contradictory to an utter lack of control. Dr. Farnsworth defines the term "utter lack of control" in terms of an impulse control problem "in which there is an inability to stop one's behavior despite being in an area of risk of being apprehended or caught."

Dr. Sharon Satterfield, the court-appointed examiner at the initial hearing and the review hearing, testified that at the time of the initial commitment, appellant had convinced her of his remorse and willingness to enter treatment. Her opinion had been that he did not have a psychopathic personality, although she believed he needed treatment. After recently interviewing appellant and reviewing his records, Dr. Satterfield now believes he has a psychopathic personality.

Dr. Satterfield cited the fact that he brutally sexually abused the minor female, C.G., while staying with the minor's family. He exhibited the same pattern with C.G. as he did with his earlier sexual assaults. Even without C.G.'s testimony, however, the earlier commitment as a psychopathic personality was consistent with Dr. Satterfield's present clinical impressions. Appellant now denies he has harmed children and has repeatedly turned down treatment. She testified it would be "almost a sure thing he would reoffend if he were not in a secured setting." She cited a continued pattern of grooming behavior with children, including the classic pedophilic grooming behavior of receiving and keeping love letters from young teenagers, and carrying young children's pictures in his wallet. He has continued his drinking behavior even though he has been warned that alcohol removes inhibitions in his behavior. She was concerned about the fact that appellant resided in households in New York where there were children present, even though he had been told "in no uncertain terms that he cannot be with children." According to Dr. Satterfield, he is a classic example of a psychopathic personality in that he was actually committed and fled.

With respect to the *Pearson* criteria, Dr. Satterfield found that appellant's behavior was habitual. She also found that appellant demonstrates an utter lack of power to control his sexual impulses, even though he is not out of control every second of every day. He has absolutely no boundaries around his sexual behavior and impulses, and is extremely likely to have absolutely no controls on his "triggers."

1. See *State ex rel. Pearson v. Probate Court,* 205 Minn. 545, 555, 287 N.W. 297, 302 (1939) (construing statutory definition of psychopathic personality), *aff'd,* 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940); *see also In re Blodgett,* 510 N.W.2d 910, 915 (Minn.) (applying *Pearson* test), *cert. denied,* —— U.S. ——, 115 S.Ct. 146, —— L.Ed.2d —— (1994).

Dr. Myron Malecha testified that statutory criteria for commitment as a psychopathic personality are met. Before hearing C.G.'s testimony, Dr. Malecha testified that he had believed the case was marginal or did not meet the *Pearson* criteria of utter lack of power to control sexual impulses. Dr. Malecha noted that there is a point, particularly when appellant is rebuffed, that he loses control. All three experts believed that unless treated, appellant is likely to reoffend, and that the least restrictive treatment would be the security hospital.

The trial court made detailed findings and concluded that appellant met the standards for commitment as a psychopathic personality for an indeterminate period. While it cited C.G.'s testimony, the trial court expressly found that the petitioner had met its burden of proving by clear and convincing evidence that appellant continued to meet the criteria of a psychopathic personality without considering C.G.'s testimony. It committed him to the Minnesota Security Hospital for an indefinite period.

## ISSUES

I. Did the trial court improperly admit the telephone testimony?

II. Did appellant waive his right to object to the admission of certain exhibits?

III. Did the evidence support the determination that appellant has a psychopathic personality?

IV. Did the evidence support the determination that the Minnesota Security Hospital is the least restrictive treatment alternative for appellant?

## ANALYSIS

### I.

■ Appellant challenges the trial court decision to allow C.G. to testify by telephone from New York.

The trial court reasoned that testifying over the telephone is similar in substance to a telephone deposition, which is expressly authorized by the rules. Minn.R.Civ.P. 30.02(g). The deposition testimony of a witness may be used by any party for any purpose if the witness is more than 100 miles away from the place of the hearing or is out of state. Minn.R.Civ.P. 32.01(c)(2). Since C.G.'s deposition testimony would have been admissible, the court found her telephone testimony admissible. We disagree.

The testimony of witnesses shall be taken orally in open court unless otherwise provided by the rules. Minn.R.Civ.P. 43.01. This court has ruled that a trial court's decision to admit records based upon foundation provided by a witness who testified by telephone was an abuse of discretion, characterizing the practice as "fraught with danger and highly irregular." *In re Martin,* 458 N.W.2d 700, 703–04 (Minn.App.1990). Under rule 43.01 and *Martin,* telephone testimony is not permitted.

The trial court distinguished *Martin* because the procedural safeguards used in this case were not used by the trial court in *Martin* and the testimony in *Martin* was used to authenticate a business record that the person testifying over the telephone could not see. Although the trial court's effort to provide procedural safeguards was creative and commendable, we do not believe the safeguards permit admission of this testimony under rule 43.01.

Rule 43.01 controls the form of testimony. The fact that the substance of a witness's testimony is admissible in one form does not make the same substantive testimony admissible in another form. When deposition testimony is taken by telephone, the trier of fact receives a written transcript of the testimony. In contrast, when a witness testifies over the telephone rather than in open court, the trier of fact receives live testimony in a different form.

With telephone testimony, the trier of fact can perceive some of the indicia of credibility, such as tone of voice, but cannot perceive others, such as body language. With in court testimony, the trier of fact can perceive both visual and aural indicia of credibility. Under rule 43.01 and *Martin,* telephone testimony is not a permitted substitute for oral testimony in open court. The trial court abused its discretion in allowing C.G. to testify by telephone.

## II.

■ Appellant also challenges the trial court decision to admit certain exhibits over his objection. He did not brief this issue, but instead cited his arguments as set out in the transcript. Generally, when an issue is not argued in the briefs it is deemed waived. *Balder v. Haley*, 399 N.W.2d 77, 80 (Minn. 1987). We therefore decline to consider this issue.

## III.

■ Next, appellant contends that there is insufficient evidence to support the determination that he has a psychopathic personality. A psychopathic personality is defined as

the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any such conditions, as to render such person irresponsible for personal conduct with regard to sexual matters and thereby dangerous to other persons.

Minn.Stat. § 526.09 (1992).

■ The supreme court construed this statutory definition to include only

persons who by an habitual course of misconduct in sexual matters have evidenced an utter lack of power to control their sexual impulses and who as a result are likely to attack or otherwise inflict injury, loss, pain, or other evil on the objects of their uncontrolled and uncontrollable desire.

*State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). In applying the *Pearson* test, the court will consider the nature and frequency of the sexual assaults, degree of violence, relationship between the offender and victims, offender's attitude, mood, medical history and testing results, and other factors which weigh on the predatory sex impulse and lack of power to control it. *In re Blodgett*, 510 N.W.2d 910, 915 (Minn.1994), *cert.*

*denied*, —— U.S. ——, 115 S.Ct. 146, —— L.Ed.2d —— (1994).

■ The proof must be by clear and convincing evidence. *In re Rodriguez*, 506 N.W.2d 660, 662 (Minn.App.1993), *pet. for rev. denied* (Minn. Nov. 30, 1993). On appeal, findings of fact will not be reversed unless clearly erroneous. *Id.* A commitment will not be reversed based upon the erroneous introduction of evidence if properly introduced evidence supports the commitment. *Martin*, 458 N.W.2d at 705.

Appellant argues that all of the experts relied upon C.G.'s improperly admitted testimony to support their opinions. Without consideration of that evidence, he argues there was insufficient evidence to show he had an utter lack of control over his sexual impulses.

The trial court concluded that even without considering C.G.'s testimony, the evidence showed appellant continued to have a psychopathic personality. At the time of the initial commitment, appellant had already manifested a pattern of habitual sex offenses involving multiple victims over an extended period of time. He has denied the need for sex offense or chemical dependency treatment. Appellant was found to be a sexual predator in the initial commitment order, and the review hearing court found no evidence to conclude that appellant's behavior has changed since the initial commitment or that he has gained any significant insight into the harm his behavior causes.

Appellant's behavior since the initial commitment shows that he has continued the pattern of behavior that led to his original commitment. He absconded to New York, lived in homes with children, and consumed alcohol, thus exposing himself to the things that trigger his pedophilic acts. When he was arrested, he was carrying with him love letters from young teenage girls and pictures of many children in his wallet. This was described by one of the court-appointed examiners who testified as classic pedophilic grooming behavior. Appellant has not voluntarily engaged in any treatment.

The court specifically addressed the *Pearson* criteria. It found that the evidence presented in the hearing showed appellant exhibited an utter lack of power to control his

sexual impulses through a habitual course of misconduct in sexual matters, and as a result is likely to reoffend, and continues to pose a danger to the public. The similarities between the incidents of sexual activity with children reveal a habitual pattern of "grooming" victims, developing a relationship with victims before becoming sexually involved with them. Although the "grooming" process requires time, thus eliminating any "suddenness" regarding the sexual activity, the habitual nature of appellant's predatory sexual conduct indicates an inability to stop the "grooming" behavior. The trial court reasoned that appellant's failure to remove himself from situations that provide the opportunity for similar offenses, and his failure to avoid precursors that trigger his impulsive behavior, such as consumption of large quantities of alcohol, demonstrate his lack of control. His impulsiveness is also evidenced by the established pattern of escape when appellant is suddenly faced with the consequences of his own failure to comply with probation terms or other restrictions. Thus, the court found that respondent's conduct manifests the "utter lack of power to control" contemplated in *Pearson.*

The trial court had extensive evidence other than C.G.'s testimony upon which to support its determination. Appellant was found to have a psychopathic personality after his initial hearing, before the alleged incident with C.G. occurred. The court noted two experts had concluded appellant satisfied the statutory requirements for commitment as a psychopathic personality before C.G.'s testimony. The court also received evidence that appellant was untreated, had absconded to New York and engaged in activities he had been warned to avoid, including living in homes with children and consuming alcohol.

All three expert witnesses testified that appellant is likely to reoffend under the right circumstances if he does not receive long term treatment to deal with his problems. The trial court was not clearly erroneous in determining that even without considering C.G.'s testimony, appellant has demonstrated an utter lack of power to control his sexual impulses. *See In re Monson,* 478 N.W.2d 785, 789 (Minn.App.1991) (commitment up-

held based on evidence similar to evidence in this case); *see also In re Blodgett,* 490 N.W.2d 638, 642–43 (Minn.App.1992) (applying "utter lack of power to control" standard), *aff'd,* 510 N.W.2d 910 (Minn.1994).

In an opinion released after the trial court considered this case, the supreme court directed:

Where utter uncontrollability of sexual impulses is found, * * * the trial court, in predicting serious danger to the public, should consider the following factors if such evidence is presented: (a) the person's relevant demographic characteristics (*e.g.,* age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's background (*e.g.,* data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to therapy programs.

*In re Linehan,* 518 N.W.2d 609, 614 (Minn. 1994).

Although the trial court did not have the benefit of the supreme court's recent opinion when it determined that appellant is dangerous to other persons, the trial court's findings demonstrate that it considered many of the factors listed in the opinion.

Evidence of relevant demographic data and related base rate statistics for violent behavior was not presented. But the trial court did consider appellant's history of violent behavior, the sources of stress in the environment that prompt appellant to become violent, the similarity between appellant's current circumstances and the circumstances under which he committed sexual offenses in the past, and appellant's failure to complete any sex therapy program. With respect to these factors, the trial court found:

[Appellant] is irresponsible in his sexual conduct and fails to appreciate the harm it imposes on his victims, and is thereby dangerous to other persons. [Appellant] has a history of seeking self-gratification without regard to how his actions will affect other people. [Appellant] had forced sex with his sister-in-law when his wife was pregnant because it "felt right at the time." * * * [Appellant] engaged in criminal sexual activity with his young children because his friend had told him about sex with young children and he wanted to experience it for himself so he "experimented" with his children. * * *

* * * The court finds that [appellant] has not made significant progress in any treatment programs, and is likely to reoffend if released from a treatment facility. Historically, [appellant] has refused to voluntarily participate in alcohol or sex offender treatment programs. Because [appellant] has an IQ of 78 and is borderline mentally retarded, his ability to comprehend what is appropriate sexual behavior for an adult male is questionable. Expert testimony revealed that pedophiles who are not treated have a high rate of recidivism. The three expert witnesses agreed that [appellant] would re-offend if the right circumstances arose and [appellant] befriends a young female. [Appellant's] conduct has been consistent with the typical behavior patterns of pedophiles described by the three expert witnesses. Both times he has been released from incarceration, [appellant] engaged in inappropriate sexual activity with minors. His predatory sexual conduct demonstrates a pattern of grooming behavior, and goes beyond mere incest.

The reviewing court also confirmed the initial commitment court's finding that appellant "becomes impatient and aggressive when his demands are not met."

We believe the trial court findings demonstrate that it adequately considered the factors set forth in *Linehan* when it determined that appellant is dangerous to others.

### IV.

■ The final issue is whether the trial court had clear and convincing evidence to conclude that indeterminate commitment at the security hospital was the least restrictive alternative that meets appellant's treatment needs.

Generally, the procedures in chapter 253B for persons committed as mentally ill and dangerous apply to persons committed as a psychopathic personality, except as otherwise specified. Minn.Stat. § 526.10, subd. 1 (1992). If the court finds after a review hearing that a patient continues to be a psychopathic personality, the court shall order commitment for an indeterminate period. *See* Minn.Stat. § 253B.18, subd. 3 (1992) (indeterminate commitment for mentally ill and dangerous). The court must make a finding that there is no appropriate less restrictive alternative available. Minn.R.Civ. Commitment 12.06; *see also In re Schauer*, 450 N.W.2d 194, 197–98 (Minn.App.1990).

The trial court found that the security hospital was the least restrictive alternative available. Appellant needs long-term treatment in a group therapy setting. He has not participated in sex offender treatment on a voluntary basis, and if released would likely fail to participate in treatment. A secured setting is required because of appellant's history of flight when involved in legal proceedings. The court found that testimony established that the security hospital is the only secure facility that offers long-term sex offender and chemical dependency treatment.

Appellant contends there was insufficient evidence to support this finding. Although he acknowledges he has absconded from the state in the past, he cites his own testimony that he is now willing to obtain treatment. He also questions the effectiveness of the security hospital treatment program and contends his case manager did not sufficiently investigate alternatives.

The three psychiatrists who testified and appellant's case manager concurred that the only treatment alternative meeting security needs and appellant's treatment needs is commitment to the security hospital. The experts cited appellant's escapes in the past and the treatment that the security hospital offers. The trial court's conclusion that the security hospital is the least restrictive alter-

native is supported by the evidence, and is not clearly erroneous.

## DECISION

The commitment of appellant to the Minnesota Security Hospital for an indeterminate period is affirmed.

**Affirmed.**