John Anton JOELSON, petitioner,
Appellant,

Clarence Pedro Patterson,
petitioner, Appellant,

Gary Alan Mattson, petitioner,
Appellant,

Julian A. Caprice, f/k/a Wilbert
Buckhalton, petitioner,
Appellant,

Thomas Ray Duvall, Appellant,

v.

Michael O'KEEFE, Commissioner of
Human Services, Respondent.

Nos. C7–98–1973, C5–98–2121, C9–98–
1974, C3–98–2246, C3–98–2120.

Court of Appeals of Minnesota.

May 18, 1999.

Review Denied July 28, 1999.

Stephen D. Radtke, Minneapolis, MN, for appellants.

Mike Hatch, Attorney General, Steven J. Lokensgard, Assistant Attorney General, St. Paul, MN, for respondent Commissioner of Human Services.

Amy Klobuchar, Hennepin County Attorney, Carolyn A. Peterson, Assistant County Attorney, Minneapolis, MN, for respondent Hennepin County.

Considered and decided by RANDALL, Presiding Judge, HARTEN, Judge, and G. BARRY ANDERSON, Judge.

## OPINION

HARTEN, Judge.

The appellants, all of whom have been committed indeterminately as psycho-

pathic personalities, brought individual petitions for writs of habeas corpus to challenge the constitutionality of their commitments. The district courts denied the petitions and these appeals followed, which we consolidated because they raise similar legal issues. Respondent's motion to strike portions of the appendices of two appellants (for including materials not part of the trial court record) was unopposed. We affirm and grant in part and deny in part respondent's motion.

## FACTS

*Joelson v. O'Keefe* (C7–98–1973)

On January 20, 1982, Joelson was initially committed as a psychopathic personality. On April 2, 1982, after a review hearing, his commitment was made indeterminate. A three-judge appeal panel affirmed. After a further appeal, the supreme court upheld his commitment on the merits but remanded it for new evidence on treatment. *In re Joelson*, 344 N.W.2d 613, 614 (Minn.1984). On remand, the district court found that the Minnesota Security Hospital was the least restrictive placement, which was affirmed on appeal. *In re Joelson*, 385 N.W.2d 810, 811–12 (Minn.1986).

Joelson then sought discharge from commitment. On August 4, 1995, the Commissioner of Human Services denied his petition. On February 20, 1996, his petition for rehearing and reconsideration before the judicial appeal panel was denied. We affirmed. *Joelson v. Petraborg*, No. C9–96–805,1996 WL 523804 (Minn. App. Sept.17, 1996), *review denied* (Minn. Nov. 20, 1996). Joelson petitioned for a writ of habeas corpus. On October 2, 1998, the district court denied the petition, and Joelson appeals.

*Patterson v. O'Keefe* (C9–98–1974)

On May 3, 1994, Patterson was initially committed as a psychopathic personality.

He appealed, challenging the merits and the constitutionality of his commitment. We affirmed. *In re Patterson*, No. C0–94–1367, 1994 WL 615035 (Minn.App. Nov. 8, 1994), *review denied* (Minn. Jan. 13, 1995), *cert. denied*, 515 U.S. 1124, 115 S.Ct. 2281, 132 L.Ed.2d 284 (1995). On March 3, 1995, the district court made his commitment indeterminate after a review hearing. Patterson's appeal from the indeterminate commitment was also unsuccessful. *In re Patterson*, No. C3–95–935 1995 WL 550898 (Minn.App. Sept.19, 1995), *review denied* (Minn. Nov. 3, 1995). Patterson petitioned for a writ of habeas corpus. On October 2, 1998, the district court denied his petition. Patterson appeals.

*Mattson v. O'Keefe* (C3–98–2120)

On January 3, 1995, Mattson was initially committed as a psychopathic personality. We affirmed. *In re Mattson*, No. C5–95–452, 1995 WL 365374 (Minn.App. June 20, 1995), *review denied* (Minn. Aug. 30, 1995). On October 6, 1995, the district court made his commitment indeterminate. We also affirmed the indeterminate commitment. *In re Mattson*, No. C8–95–2423, 1996 WL 167638 (Minn.App. Apr.9, 1996), *review denied* (Minn. May 21, 1996). Mattson petitioned for a writ of habeas corpus. On October 17, 1998, the district court denied his petition. Mattson appeals.

*Caprice v. O'Keefe* (C5–98–2121)

On February 5, 1993, Julian Caprice, formerly known as Wilbert Buckhalton, was initially committed as a psychopathic personality. We affirmed. *In re Buckhalton*, 503 N.W.2d 148 (Minn.App.1993), *aff'd mem.*, 518 N.W.2d 531 (Minn.1994). On November 12, 1993, the district court held a review hearing and made his commitment indeterminate. We affirmed the indeterminate commitment. *In re Buckhalton*, No. C2–93–2428, 1994 WL 43870 (Minn.App. Feb.15, 1994), *review denied* (Minn. Mar. 31, 1994), *cert. denied*, 513

U.S. 850, 115 S.Ct. 148, 130 L.Ed.2d 88 (1994). Caprice then sought full discharge. After the Commissioner of Human Services denied his petition, he appealed to the judicial appeal panel, which also denied the petition. Caprice appealed and we affirmed. *Caprice v. Gomez*, 552 N.W.2d 753 (Minn.App.1996), *review denied* (Minn. Oct. 29, 1996). Caprice petitioned for a writ of habeas corpus. On October 17, 1998, the district court denied his petition. Caprice appeals.

*Duvall v. O'Keefe* (C3–98–2246)

On April 4, 1991, Thomas Duvall was committed as a psychopathic personality. On August 14, 1991, his commitment was made indeterminate. We affirmed. *In re Duvall*, No. C5–91–1799, 1991 WL 276194 (Minn.App. Dec.31, 1991), *review denied* (Minn. Mar. 26, 1992). Duvall filed his first petition for a writ of habeas corpus, which the district court denied on May 20, 1996. We affirmed. *Duvall v. Doth*, No. C2–96–1262, 1996 WL 636245 (Minn.App. Nov.5, 1996), *review denied* (Minn. Jan. 6, 1997). He filed another petition for a writ of habeas corpus. On November 9, 1998, the district court denied the petition. Duvall appeals.

## ISSUES

1. Does the sexual psychopathic personality act comport with substantive due process in light of *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)?

2. Were appellants committed without the requisite showing that they exhibited an utter lack of power to control their sexual impulses?

3. Does *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), impose new procedural requirements that supplement the sexual psychopathic personality act?

4. Does commitment as a sexual psychopathic personality violate the prohibition against double jeopardy?

5. Should respondent's motion to strike portions of Mattson's and Caprice's appendices be granted?

## ANALYSIS

■ An appellate court will review a habeas corpus decision de novo where, as here, the facts are undisputed. *State ex rel. Hussman v. Hursh*, 253 Minn. 578, 578 n. 1, 92 N.W.2d 673, 673 n. 1 (1958).

■ Committed persons may challenge the legality of their commitment through habeas corpus. *State ex rel. Anderson v. United States Veterans Hosp.*, 268 Minn. 213, 217, 128 N.W.2d 710, 714 (1964); *see* Minn.Stat. ch. 589 (1998) (providing procedures for writ of habeas corpus); Minn.Stat. § 253B.23, subd. 5 (1998) (stating that the commitment statute is not intended to abridge right to habeas corpus). But the only issues the district court will consider are constitutional and jurisdictional challenges. *Anderson*, 268 Minn. at 217, 128 N.W.2d at 714. Further, appellants are not entitled to obtain review of an issue previously raised. *See State ex rel. Crippen v. Tahash*, 274 Minn. 565, 565–66, 143 N.W.2d 383, 384 (1966) (declining to address issues in habeas appeal that had been raised previously); *State ex rel. Thomas v. Rigg*, 255 Minn. 227, 234, 96 N.W.2d 252, 257 (1959) (habeas may not substitute for appeal or be used to collaterally attack commitment).

### 1. SPP Commitment: Substantive Due Process

■ Appellants first argue that their sexual psychopathic personality (SPP) commitments violate substantive due process under *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). The appellants were committed under either the earlier version of the SPP law, found most recently at Minn.Stat. § 526.09 (1992), or under the recodified

version, renamed "[s]exual· psychopathic personality," now at Minn.Stat. § 253B.02, subd. 18b (1998).

The supreme court upheld section 526.09 as constitutional against a void for vagueness challenge through the use of narrowing language requiring "an utter lack of power to control [the person's] sexual impulses." *State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 555, 287 N.W. 297, 302 (1939), *aff'd*, 309 U.S. 270, 60 S.Ct. 523, 84 L.Ed. 744 (1940). Minn.Stat. § 253B.02, subd. 18b, incorporates the *Pearson* language; the legislature did not intend to change the meaning of this law by the recodification. 1994 Minn. Laws 1st Spec. Sess. art. 1, § 5(a). In 1994, the supreme court likewise upheld the constitutionality of the psychopathic personality law under *Pearson* against substantive due process and equal protection challenges. *In re Blodgett*, 510 N.W.2d 910, 916–17 (Minn.), *cert. denied*, 513 U.S. 849, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994).

Appellants contend that *Hendricks* requires evidence of an inability to control sexual impulses as a constitutional predicate to commitment as a sexual predator. But Minnesota law already requires utter lack of power to control sexual impulses for an SPP· commitment. Minn.Stat. § 253B.02, subd. 18b. Further, *Hendricks* cited with approval the Minnesota psychopathic personality law. 117 S.Ct. at 2080. Consequently, we need not decide in this case whether *Hendricks* mandates a showing of an utter lack of power to control sexual impulses for commitment of any sexual predator. We note that this issue currently is pending before the supreme court, which is addressing the constitutionality of the sexually dangerous person (SDP) act, Minn.Stat. § 253B.02, subd. 18c (1998), under *Hendricks*. *In re Linehan*, 557 N.W.2d 171 (Minn.1996), *vacated & remanded*, —— U.S. ——, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997).

**2. Habeas Corpus Appeal Limitations**

▆▆▆▆ Appellants next contend that their commitments were based solely on mental disorders, without the necessary evidence or findings as to lack of control. But in none of the cases do the appellants make specific arguments concerning the law or the facts. *See, e.g., Blodgett*, 510 N.W.2d at 915 (setting out factors to consider in determining whether person exhibited predatory sexual impulse and utter lack of power to control it). When a party does not support an assertion with argument or authority, the argument is waived absent obvious prejudicial error. *Schoepke v. Alexander Smith & Sons Carpet*, 290 Minn. 518, 519–20, 187 N.W.2d 133, 135 (1971); *see In re Bieganowski*, 520 N.W.2d 525, 529 (Minn.App.1994) (declining to consider issue when appellant failed to brief it and instead cited arguments in transcript), *review denied* (Minn. Oct. 27, 1994). Appellants have waived this argument.

Moreover, in all of the instant cases, appellants have already obtained review of the sufficiency of the evidence in other proceedings. *See Crippen*, 274 Minn. at 565–66, 143 N.W.2d at 384 (declining to address issues in habeas appeal that had been raised previously). In *In re Joelson*, the supreme court affirmed the holding that there was clear and convincing evidence that Joelson was an SPP within the meaning of Minn.Stat. § 526.09, stating "[n]o further evidence to support this finding is necessary." *In re Joelson*, 344 N.W.2d 613, 614 (Minn.1984).

Patterson raised the lack of control issue in his appeal from the initial commitment, and we concluded that the district court correctly held that Patterson lacked the power to control his sexual impulses. *In re Patterson*, No. C0–94–1367, 1994 WL 615035 (Minn.App. Nov. 8, 1994), *review denied* (Minn. Jan. 13, 1995), *cert. denied*, 515 U.S. 1124, 115 S.Ct. 2281 (1995). Patterson raised the issue again in his appeal from his indeterminate commitment, and we again affirmed. *In re Patterson*, No. C3–95–935, ·1995 WL 550898 (Minn.App.

Sept.19, 1995), *review denied* (Minn. Nov. 3, 1995).

Mattson also specifically challenged the lack of control determination in the appeal from his initial commitment, which we affirmed. *In re Mattson*, No. C5–95–452, 1995 WL 365374 (Minn.App. June 20, 1995), *review denied* (Minn. Aug. 30, 1995). We also upheld the indeterminate commitment, including the district court determination that Mattson continued to have an utter lack of power to control his sexual impulses. *In re Mattson*, No. C8–95–2423, 1996 WL 167638 (Minn.App. Apr.9, 1996), *review denied* (Minn. May 21, 1996).

We upheld the Caprice (formerly known as Buckhalton) commitment, specifically addressing the district court's determination of an utter lack of power to control his sexual impulses. *In re Buckhalton*, 503 N.W.2d 148, 153 (Minn.App.1993), *aff'd mem.*, 518 N.W.2d 531 (Minn.1994). We also upheld the indeterminate commitment, which included the district court's finding of an utter lack of control over his sexual impulses. *In re Buckhalton*, No. C2–93–2428, 1994 WL 43870 (Minn.App. Feb.15, 1994), *review denied* (Minn. Mar. 31, 1994), *cert. denied*, 513 U.S. 850, 115 S.Ct. 148, 130 L.Ed.2d 88 (1994).

Finally, we upheld Duvall's indeterminate commitment and rejected the argument that the threshold issue of lack of control had not been met. *In re Duvall*, No. C5–91–1799, 1991 WL 276194 (Minn. App. Dec.31, 1991), *review denied* (Minn. Mar. 26, 1992). Duvall also filed an earlier petition for a writ of habeas corpus. We affirmed the district court's denial of the petition and declined to review the issue of lack of control that we addressed in the prior appeal. *Duvall v. Doth*, No. C2–96–1262, 1996 WL 636245 (Minn.App. Nov.5, 1996), *review denied* (Minn. Jan. 6, 1997).

### 3. SPP Commitment: Procedural Adequacy

Appellants contend that the SPP law deprives them of their right to procedural due process and that it falls far short of the procedural protections that the United States Supreme Court recognized in upholding *Hendricks*. We note that the Supreme Court has upheld, against a procedural due process challenge, the psychopathic personality law in a version substantially similar to the present law. *State ex rel. Pearson v. Probate Court*, 309 U.S. 270, 275–77, 60 S.Ct. 523, 526–27, 84 L.Ed. 744 (1940).

■ Appellants first challenge the SPP statute because it does not provide for a jury trial in a commitment proceeding. In *Hendricks*, the subject individual obtained a jury trial to determine beyond a reasonable doubt whether he was a sexually violent predator. *Hendricks*, 117 S.Ct. at 2078. He then challenged the statute on double jeopardy grounds, contending that the proceeding was criminal in nature because the statute allowed procedural safeguards traditionally found in criminal trials. *Id.* at 2081–83. The Supreme Court rejected this argument, concluding that the numerous protections merely demonstrated that the legislature authorized confinement of a narrow class of particularly dangerous individuals only after meeting the strictest procedural standards. *Id.* at 2083. A jury trial was not required. Further, the Minnesota Supreme Court has rejected the argument that a jury trial is required. *Pearson*, 205 Minn. at 556–57, 287 N.W. at 303.

Appellants also contend the SPP statute is unconstitutional because it fails to require the state to conduct periodic judicial reviews to determine whether the initial commitment standards continue to be met. *Hendricks*, 117 S.Ct. at 2078 (describing provisions of Kansas statute). But again, the United States Supreme Court did not mandate adoption of these procedures to maintain the constitutionality of a sexual predator commitment law.

■ Furthermore, the Minnesota Supreme Court has rejected the argument

that a patient committed as SPP cannot be subject to continued commitment unless the patient meets the initial criteria for commitment. *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn.1995). Instead, the supreme court held that as long as the application of statutory discharge criteria meets the constitutional requirement that the nature of the commitment be reasonably related to the purpose for which the person was committed, due process is satisfied. *Id.* The ultimate burden in discharge proceedings rests on the state. *Caprice v. Gomez*, 552 N.W.2d 753, 758 (Minn.App. 1996), *review denied* (Minn. Oct. 29, 1996). Additionally, some of the appellants have already obtained review of their challenges to the discharge proceedings. *Id.* at 758–59 (upholding discharge procedures against burden of proof, due process, void for vagueness, double jeopardy, and equal protection claims); *Joelson v. Petraborg*, No. C9–96–805 1996 WL 523804, (Minn. App. Sept.17, 1996) (rejecting same challenges), *review denied* (Minn. Nov. 20, 1996).

■ Appellants contend that the supreme court's interpretation of the requirements in the SDP act as to the likelihood of reoffending should apply to an SPP commitment. *Linehan*, 557 N.W.2d at 180–81. Commitment as an SDP requires that it be "likely" the person will "engage in acts of harmful sexual conduct." Minn.Stat. § 253B.02, subd. 18c(a)(3). In *Linehan*, the state argued that the meaning of "likely" in the SDP statute was "more likely than not." 557 N.W.2d at 180. The supreme court construed the SDP act provision to require a showing that the person was "highly likely to engage in harmful sexual conduct" in order to satisfy the clear and convincing evidentiary standard of proof employed in all civil commitments. *Id.* at 174. Appellants argue that because the same standard was not applied to their SPP commitments, they are unconstitutional.

In imposing this requirement, the supreme court wanted to insure that district courts applied the clear and convincing standard of proof to all SDP factors, in the face of the state's argument to the contrary. *Id.* at 180. The supreme court did not extend this requirement to SPP commitments. In fact, it was unnecessary to do so because the court had recently addressed the relevant standard, stating "the burden is on the state to prove by clear and convincing evidence, each of the three elements set out in *Pearson.*" *In re Linehan*, 518 N.W.2d 609, 610 (Minn.1994). The court further clarified the standard for the dangerousness showing in a psychopathic personality commitment case, listing factors that the district court could consider in predicting "serious danger to the public." *Id.* at 614; *see Linehan*, 557 N.W.2d at 189 (same factors should be considered in determining dangerousness in SDP commitment). Appellants make no claim that the district courts did not apply the clear and convincing standard, and their argument has no merit.

### 4. SPP Commitment: Double Jeopardy

■ Appellants argue that their commitments violate the prohibition against double jeopardy. *See Hendricks*, 117 S.Ct. at 2086 (upholding Kansas law against double jeopardy challenge). The Minnesota Supreme Court has held that an SPP commitment does not constitute double jeopardy because it is for purposes of treatment, not preventive detention. *Call*, 535 N.W.2d at 319–20; *see Caprice*, 552 N.W.2d at 759 (also rejecting double jeopardy claim).

Appellants nonetheless contend that the SPP statute is punitive, based on several statutes that may affect those who are committed thereunder. First, appellants contend that persons committed as SPP are not considered vulnerable adults under Minn.Stat. § 626.557 (1998) (providing for reporting of maltreatment of vulnerable

adults). A "vulnerable adult," however, may include a person committed as an SPP or SDP if the person has a physical or mental infirmity or dysfunction impairing his ability to care for himself and to protect himself from maltreatment. Minn. Stat. § 626.5572, subd. 21(2), (4) (1998).

Appellants also cite Minn.Stat. § 201.15, subd. 1(c) (Supp.1997), which at one time provided that persons adjudged an SDP or SPP were ineligible to vote. Appellants acknowledge, however, that in the 1998 legislative session the legislature repealed this language. 1998 Minn. Laws ch. 376, § 1. The legislature at the same time amended Minn.Stat. § .609.165, subd. 1c, to state:

> Notwithstanding subdivision 1, a person who has been deprived of civil rights by reason of conviction of a crime is not restored to civil rights as long as the person remains civilly committed under chapter 253B or Minnesota Statutes 1992, section 526.10, based in whole or in part on the same conduct as caused the person to be convicted of the crime.

1998 Minn. Laws ch. 376, § 5. Appellants acknowledge that the new law does not disenfranchise them.

Appellants further contend that if a person is committed as an SPP after being consigned to the corrections department, the person is denied treatment as an SPP until he first completes the sentence in a facility designated by the corrections commissioner. Minn.Stat. § 253B.185, subd. 2(b) (1998). After the person has finished the sentence, the person then shall be transferred to a regional center designated by the human services department. *Id.*; *cf.* Minn.Stat. § 241.69, subd. 4 (1998) (if mentally ill prisoner is committed, court may commit person to psychiatric unit in correctional facility.or to another hospital). This procedure does not render the commitment statute punitive; had the person not been committed, he still would have had to serve time in the correctional facility.

We conclude that while some of these statutory provisions may affect those committed under the SPP statute, appellants have not shown any reason that the provisions render the commitment statute punitive.

## 5. Respondent's Motion to Strike

Finally, respondent moves to strike material contained in Mattson's and Caprice's appendices, contending that they contain material not part of the habeas record. The challenged items are the commitment petitions and reports and transcripts, apparently from the commitment proceedings. Mattson and Caprice have not responded to this motion.

■ Generally, an appellate court may not consider matters not received in evidence below. *Thiele v. Stich*, 425 N.W.2d 580, 582–83 (Minn.1988); *see* Minn. R. Civ. App. P. 110.01 (providing record on appeal consists of papers filed in trial court, exhibits, and transcripts). Upon proper motion, we will strike material contained in the appendix that was not presented to the district court. *Fluoroware, Inc. v. Chubb Group of Ins. Companies*, 545 N.W.2d 678, 684 (Minn.App.1996).

A review of the district court record shows that with one exception, none of the challenged material is contained in the district court record for the habeas proceeding. That exception is a May 7, 1993, report by R. Owen Nelson, found in Caprice's appendix. This report was in the appendix of respondent's memorandum to the district court and thus would properly be included on appeal. We strike the remaining material from the record on appeal.

## DECISION

The decisions of the district courts denying the petitions for a writ of habeas cor-

pus are affirmed. Respondent's motion to strike is granted in part and denied in part.

**Affirmed; motion granted in part and denied in part.**

RANDALL, Judge (concurring specially).

I concur in the result. The result, to me, is the continued "preventive detention" of the five appellants, not for any crimes they have committed, as they have already served all of the lengthy sentences imposed for those crimes, but preventive detention because of a public policy decision that "they might do it again in the future."

I correctly predicted in *In re Linehan* that the case was just one more step in a continuing round of steps to sidestep the Bill of Rights and keep people committed under the Sexual Psychopathic Personality Commitment Act (SPP) and/or the Sexually Dangerous Persons Act (SDP) (now codified in Minn.Stat. Ch. 253B (1998)) in a locked secured facility, not for a crime, but simply because we do not want to let them out. *In re Linehan*, 544 N.W.2d 308, 319–26 (Minn.App.1996) (Randall, J., dissenting) (*Linehan I*), *aff'd*, 557 N.W.2d 171 (Minn.1996) (*Linehan II*) *judgment vacated and remanded*, *Linehan v. Minnesota*, — U.S. —, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997) (*Linehan III*).

I concurred before, and for the same reasons. I said in *In re Mattson*:

Under present Minnesota precedent, the result is correct. But I am troubled by the reality that the psychopathic personality statute, if we are to be honest, is being used only for preventive detention. As Justice Wahl warned,

"[t]he rigor and methodical efficiency with which the Psychopathic Personality Statute is presently being enforced is creating a system of wholesale preven-

tive detention, a concept foreign to our jurisprudence."

*In re Mattson*, No. C5–95–452, 1995 WL 365374, at *4 (Minn.App.1995) (Randall, J., concurring specially) (quoting *In re Blodgett*, 510 N.W.2d 910, 918 (Minn.1994) (Wahl, J., dissenting)) (citations omitted), *review denied* (Minn. Aug. 30, 1995).

With these five appellants today, along with Dennis Linehan and everyone else committed within at least the last two decades under the psychopathic personality statute and its progeny, the sexual psychopathic personality statute and the sexually dangerous person act, we have embarked on, and are continuing on, a clear path of preventive detention. *See, e.g., In re Senty–Haugen*, 583 N.W.2d 266, 269–70 (Minn.1998) (holding person committed under SPP or SDP statutes has no right to receive treatment in least restrictive program); *Linehan II*, 557 N.W.2d at 187 (stating obvious interest in treating sexual preditors for mental disorders before they harm others); *Call v. Gomez*, 535 N.W.2d 312, 319 (Minn.1995) (stating commitment will last as long as person needs treatment, supervision, and poses danger to public); *Blodgett*, 510 N.W.2d at 916–17 (holding psychopathic personality statute does not violate substantive due process or equal protection guarantees of federal or Minnesota constitutions); *In re Ayers*, 570 N.W.2d 21, 25 (Minn.App.1997) (affirming commitment under SPP and SDP); *Caprice v. Gomez*, 552 N.W.2d 753, 759–60 (Minn.App.1996) (denying petition for discharge), *review denied* (Minn. Oct. 29, 1996); *In re Pirkl*, 531 N.W.2d 902, 909 (Minn.App.1995) (affirming trial court's decision that appellant exhibited utter lack of control), *review denied* (Minn. Aug. 30, 1995). For proof of this, simply go back to the time a few years ago when the psychopathic personality act failed to keep Dennis Linehan in locked confinement. *In re Linehan*, 518 N.W.2d 609, 614 (Minn.1994) (reversing and vacating Linehan's commitment as psychopathic personality).

Then read the comments in any of the daily newspapers in this state, the comments of the Ramsey County Attorney's Office, and the legislative history of the hastily thrown together sexually dangerous person act. There is no mention in any of the above of the need to get Dennis Linehan "medical treatment." There is only discussion of various ways to keep him locked up. The hastily drawn SDP followed immediately after the Minnesota Supreme Court reversed Linehan's commitment as a psychopathic personality. The only reason was to keep Dennis Linehan locked up and confined.

Whenever state supreme courts and the United States Supreme Court start down the tortured labyrinth of trying to uphold Minnesota's psychopathic personality act and recently, our sexually dangerous person act, you will find the courts doing everything possible to avoid a confrontation with the Minotaur, the Bill of Rights, and the U.S. Constitution—worthy foes against preventive detention. The United States Supreme Court made a wonderful effort in *Kansas v. Hendricks*, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), to avoid a head-on confrontation with the Bill of Rights, and without getting there, in *Linehan III*, vacated Dennis Linehan's commitment and sent it back to Minnesota for further consideration. *See Linehan III*, —— U.S. at ——, 118 S.Ct. at 596 (vacating judgment and remanding to Minnesota Supreme Court for further consideration in light of *Hendricks* ).

To sidestep the confrontation with the Bill of Rights, commitment cases are replete with cliché-ridden conclusions: "these acts are civil, not criminal," (thus, real due process is [not] necessary). By calling SPP and SDP statutes "civil," we take these commitment acts, and the participants, out of the criminal justice system. Simply put, by not calling those committed "criminals," we do not have to get into "justice."

The Due Process and Bill of Rights prohibitions against cruel and unusual punishment and double jeopardy are sidestepped by the convenient device of stating that commitments for SPPs and SDPs are "for medical treatment" and not for punishment. *See Call*, 535 N.W.2d at 320 ("[C]ommitment under the psychopathic personality statute is remedial and does not constitute double jeopardy because it is for treatment purposes and is not for purposes of preventive detention" (citations omitted)); *Blodgett*, 510 N.W.2d at 914 (stating SPPs committed for purpose of receiving treatment for mental illness).

However, to read the cases, then the case histories of those committed under the SPP and SDP statutes and then to read the legislative history surrounding the passage of SDP makes it clear that the *only* focal point of these commitments is that the person be dangerous. It has nothing to do with their being mentally ill. If they were truly mentally ill, Minnesota has a standard civil commitment act that would do nicely. Minn.Stat. § 253B.18 (providing commitment procedure for persons mentally ill and dangerous to public). But none of these five appellants, nor Linehan, nor the others committed under these two acts would likely be anywhere near truly mentally ill enough for your basic civil commitment. Also, SPP and SDP are not concerned with those men and women found not guilty of a crime by reason of insanity—meaning the criminally insane. Those defendants are properly committed to secure state hospitals for treatment. On the other hand, all five appellants today are sane, stood trial for their crimes, were found guilty and sentenced, and have served all the time they owe for those crimes.

A community, a state, is never without a remedy to handle appellants and people with similar records. When they first entered prison on their last conviction, they were all looking at lengthy sentences.

Their past behavior was well noted at that time. You are committed for SPP and SDP not for what you did in prison *after* your conviction, but for your sexual conduct patterns committed *before* you went to prison. The case histories of appellants (and other SPP/SDP committees) are well known back when they started their last sentence. To inject some kind of due process into the system, the law could require the state to make a decision within a short time after those committed started their prison sentences. The decision would be to initiate SPP or SDP or forfeit that right. I suggest a maximum of 18 to 24 months is more than enough time for the state to decide whether a defendant fits the sexual predator pattern. If the defendant does fit the sexual predator pattern, and the SPP/SDP commitment is successful, the defendant starts treatment at that point and continues it throughout their lengthy sentence until they are pronounced cured by the security hospital and returned to prison confinement, or treated until expiration of their sentence when they have to be discharged. If, during their treatment at a state security hospital, they attempt to escape or refuse treatment, fine, return them to a state prison for the remainder of their sentence. Requiring these men to be treated during their prison term, rather than after, would save the taxpayers of Minnesota hundreds of thousands of dollars, and then a few million as the years go by. The daily and/or yearly costs at a state security hospital run two to four times the cost at a state prison. Simply pick one or the other in which to confine these men during the sentence, rather than the present unconstitutional practice of having them serve a lengthy sentence in a prison, and then serve a second lengthy indeterminate sentence in a state security hospital under the guise of medical treatment, which, to me, is clearly unlawful preventive detention. Also, it is a simple enough matter to change the sentencing laws so that some-

one who has been committed as SPP/SDP during their prison term has some kind of intensive supervised release (specific probation officers, electronic monitor bracelets, etc.) after their normal discharge date when a sentence (confinement plus probation) is fully served.

If the true goal of commitment, as the state claims, is medical treatment, then anyone in the medical profession will confirm that if you have a diagnosable illness, it is preferable to start treatment as soon as possible rather than wait 10, 15, 20, or 25 years later to start treatment. So what the state does with the timing on SPP/SDP demonstrates the fallacy of the belief that "it is for medical treatment." Instead, the state chooses to wait until a substantial part, or all, of a defendant's sentence is served, and then, just before discharge, they begin the SPP/SDP process, which, if successful, will confine these men indefinitely, likely for the rest of their lives.

Because the system is called civil, not criminal, and because there is a strong public policy argument keeping these men in preventive detention (which is not talked about a lot, but I intend to talk about it), their chances of proving themselves "cured" are less than slim and equal to none. For proof of this, remember that SPP and SDP commitments are all matters of public record. Check on the number of Minnesota citizens (remember, they are committed as citizens, not as criminals, and the state has to agree with this statement because it is the touchstone of their logic—without it, the state stands guilty of constitutional improprieties) confined to locked hospitals "for treatment" in the last 20 years under psychopathic personality (PP) or its progeny, the SPP or SDP (the SPP and SDP being of more recent vintage), and see how many have been successfully discharged. When you locate the number committed and the number of those released, it is self-evident that this is not for medical treatment, but rather a continuing preventive detention.

Preventive detention is a hallmark of most dictatorships, totalitarian government, fascist government, and military junta the world over, going from present history back to ancient times. The targets are always the same: criminals, suspected criminals, ethnic minorities, political opponents, political dissidents, suspected political opponents, suspected political dissidents, at times members of the free press, at times writers, university professors, clergy of organized religions, and basically anyone those in control would like to silence.

The England of King George III, just prior to the thirteen American colonies coming into existence, had preventive detention. This was one of the reasons our forebearers left for the country we now call America. In England, people could be picked up and held for weeks or months, or years on "suspicion" or because the government considered them dangerous or political dissidents. They may or may not have been brought promptly before a magistrate to be informed of their charges. they may or may not have had access to an attorney. They may or may not have had access to the outside world, their families, and paper and pens to write. They may or may not have just "disappeared." We will never know. If a reason was needed to confine somebody who had not been formally accused of a crime and formally convicted in an open and fair trial, a reason would be found. That form of government is exactly why the founding fathers at the constitutional convention specifically insisted on certain sections of the Bill of Rights. They put into our constitution specific amendments to protect against "preventive detention." The Fifth, Sixth, and Eighth Amendments to the Constitution forbid excessive bail, cruel and unusual punishment, trying, and punishing a person twice for the same crime (double jeopardy), and guarantee a fair trial, the right to counsel, guaranty a speedy trial, prohibit excessive incognito detention, and place on the government the requirement to get you quickly before a magistrate/judge to at least be informed of the charges against you and to have a hearing on bail. U.S. Const. amend. V, VI, VIII.

We should go slow before amending the Minnesota Constitution and the United States Constitution to allow for preventive detention. But since that is what we are doing now with SPP/SDP, we might as well talk about it openly and give it our official imprimatur.

After all, this country is used to "tough times calling for tough decisions." During World War II, we endured rationing, an involuntary draft, rent controls, wage and price controls, etc. We allowed many things to happen in wartime that we might not allow in a time of peace. At the outset of the Great Depression, President Franklin Roosevelt and his congress passed a number of emergency measures to counteract raging economic hardship. Some of those acts, like the Agricultural Adjustment Act of 1933, were eventually declared unconstitutional by the United States Supreme Court. *See United States v. Butler*, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (holding Agriculture Adjustment Act of 1933, ch. 25, 48 Stat. 31 (1933), unconstitutional). Other executive acts and acts of congress were struck down, but many were not, because the Depression continued and issues needed immediate attention. I suspect that many of the acts that were not declared unconstitutional then might today, in these affluent times, run the risk of being struck down.

We can tinker openly with the U.S. Constitution if, as a community, we decide to. In 1920, the Constitution stated that honest bartenders could no longer sell alcohol, only organized crime could. *See* U.S. Const. amend. XVIII (prohibiting manufacturing, selling, or transporting intoxicating liquors). Then in 1933, when that

noble social experiment proved a failure, the Constitution said that honest bartenders could again sell alcohol. *See* U.S. Const. amend. XXI, § 1 (repealing prohibition). We admitted a mistake had been made and went on. At least we were open and honest about that. We did not first make flowery rhetorical speeches about the greatness of individual liberty, and then pass prohibition at 2:00 a.m. in the dead of night when nobody was looking. When that social experiment failed, we did not make flowery rhetorical speeches about the evils of "demon rum" and then quietly, at 2:00 a.m. in the dead of night, pass the repealer—we did it out in the open.

As I stated in *Mattson*, Minnesota does not even attempt to claim justification to "medically treat" other habitual criminals. 1995 WL 365374, at *5. We give them fair trials and lengthy sentences, and when their time is served, they are entitled to a discharge from prison and they get one.

> "We do not commit and do not attempt 'to treat' first degree murderers, even contract killers, even if they have sworn vengeance against their accusers, after they have served all their time. They may be released with strong warnings not to run afoul of the law again. If there is any probation or parole time left, the state might well "sit on their heads" with onerous release conditions, but no attempt is made to commit them against their will to a hospital. First degree murder is as serious, or more serious, than sex offenses, so we cannot distinguish between the two on the basis of who has done the more heinous thing. We do not attempt to involuntarily commit and treat habitual check forgers, even though their recidivism is high or higher than sex offenders. So we cannot differentiate between the two classes on the basis of recidivism.

> Also we do not try to involuntarily commit and then treat kleptomaniacs, pyromaniacs, or any other of the 'manias' that are criminal conduct. Respondent alludes to this reasoning, and argues that sexual offenders are dangerous in a way different than those who commit these other offenses. *See also Blodgett*, 510 N.W.2d at 917 (stating there are substantial distinctions between sexual predators and other criminals). That reasoning, however, is not constitutionally significant. *Instead, it proves the point. Psychopathic personalities are the subject of preventive detention.* The state simply chooses this one class of people, to the exclusion of other classes of felons, to involuntarily commit to protect the public from any further possibility of harm—read preventive detention."

*Linehan I*, 544 N.W.2d at 326 (Randall, J., dissenting) (quoting *Mattson*, 1995 WL 365374, at *4–5 (Randall, J., concurring specially)) (alternation in original).

As I stated above, tinkering with the Constitution is not a decision to be taken lightly. The gulags of oppressive governments are too well documented to deny.

> Preventive detention bears an eerie resemblance to the old Stalinist Russia winter resort for political dissidents at the gulag archipelago.

> It bears a resemblance to our own Farewell to Manzanar. This is not to say that I am unaware that conditions in 1942 were different than conditions today. The Japanese Relocation Act was the considered decision of those in power during World War II. At least it was honest, not disguised as "remedial treatment." It was acknowledged to be pure preventive detention, preventive detention of a singled out class of people not for what they had done, but for what they might do. We look back on it now and learn. If history teaches us anything, it is that the past does not mandate the present. But history teaches

that the past dictates that we give the past thoughtful consideration when seeking guidance for the present.

*Mattson*, 1995 WL 365374, at *6 (Randall, J., concurring specially) (footnote omitted). Also, it is not much solace to say that today's gulag, our PP/SDP, is confined only to sexual predators. I see nothing in the law to keep it from being extended to anyone with a history of repetitive criminal acts, or any kind of cultural or political behavior, or any kind of noncriminal behavior that we do not like. Since SPP/SDP masquerades as civil, not criminal, it can easily be used against people who offend us with noncriminal behavior. You can say that anyone who continues to violate society's norms (our version of "norms") has some type of obsession, some type of pathology. We can give it a medical name and then also preventively detain those people for "medical treatment."

I concur in the result. The result here is to continue the indefinite preventive detention of the five appellants. My concurrence does not mean that I necessarily agree with the result, but like pornography, I do not have to agree with it to recognize it when I see it.

As a husband and a father, I could be persuaded that preventive detention of sexual predators, despite being a violation of the Bill of Rights, is good public policy. It is just that as a judge, I hate lying about it.